**AMBROSE–AUGUSTERFER CORPORATION**

v.

**The UNITED STATES.**

**No. 377–63.**

United States Court of Claims.
May 10, 1968.

Eldon H. Crowell, Washington, D. C., attorney of record, for plaintiff, David V. Anthony, C. Stanley Dees, Sellers, Conner & Cuneo, Washington, D. C., Allen J. Levin, and Folz, Bard, Kamsler, Goodis & Greenfield, Philadelphia, Pa., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

SKELTON, Judge.

The plaintiff, on behalf of its subcontractor, seeks an equitable price adjustment under a contract with the General Services Administration (GSA) for the installation of a central air-conditioning system and, alternatively, damages for breach of that contract.[1] More specifically, on March 23, 1960, the defendant through the GSA awarded plaintiff a fixed-price contract in the amount of $2,389,000. The contractual scope of work included "the furnishing of all labor and materials and performing all work required for the alterations, additions, repairs and miscellaneous changes in construction of architectural, structural, mechanical and electrical work for the installation of a new air conditioning system at the United States Post Office (Main) at 30th & Market Streets, Philadelphia 4, Pennsylvania; all as shown on * * *," specified contract drawings "and as may be directed." (Section 2–1).

Thereafter, the plaintiff awarded a subcontract to Willard Electric Construction Company for the performance of all electrical work covered by the prime contract. The issue presented to th

General Services Administration Board of Contract Appeals (GSABCA) after denial of the claim by the contracting officer, was whether plaintiff was entitled to additional compensation for work performed under protest by its subcontractor in connection with the removal, rehanging, and recircuiting of 2,398 lighting fixtures at the direction of the contracting officer. The problem was accentuated by the fact that the disputed fixtures were physically attached to existing ductwork in the building, which ductwork the plaintiff was obligated to remove. This demolition work constituted 90 percent of the total contract work. Naturally, we will explore the crucial facts and contentions of the parties in detail, but first we will summarize the factual and legal conclusions of the Board.[2]

The Board concluded, after analysis of the contract provisions and consideration of the competing interpretations, that the disputed work was a normal and expected procedure in the course of completion of such a job and required by the contract. It also found that plaintiff, "paying due heed to all requirements of its total commitment, reasonably should have known under the prevailing circumstances that the disputed fixtures were affixed to the ducts and provided with essential wire connections, or at the least could have ascertained such information had logical and prudent inquiry timely been made prior to bidding." Accordingly, the appeal was denied.

At the outset, we note that the factual findings of the Board are binding here, as they have not been upset by a showing of inadequate evidentiary support or any comparable infirmity. We also have determined that in all

1. The issue of quantum was not determined administratively, and only the question of liability is before the court.

2. This refers to three decisions of the Board rendered February 28, 1963, June 27, 1963, and August 30, 1967, respectively. The latter decision was rendered after this court suspended proceedings to allow the parties to return to the Board for a new determination as to whether in all the circumstances plaintiff should have known that the 2,398 fixtures in question were affixed to the ducts and wired through the ducts.

material respects, its legal conclusions are correct.

The plaintiff asserts two claims in connection with the lighting fixtures in dispute. The first claim consists of the cost of removing the fixtures and replacing them with new hangers after removel of the ducts to which they were originally attached. The second claim is for the cost of relocating the wiring after the removal of the ductwork in which the wiring had originally been encased.

As formulated by the parties, the dispute before the Board (as in this court) focused on the meaning and relationship of numerous contract provisions.

■ Indeed this case is a prime example to illustrate the principle that in the construction of a contract, "[t]o its words we at first resort, but not to one or a few of them but to all of them as associated, and as well to the conditions to which they were addressed and intended to provide for." Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 392, 36 S.Ct. 662, 664, 60 L.Ed. 1058 (1916).

The material facts, however, must first be related.

The post office building in which the work was to be performed contained five floors in addition to a penthouse and sub basement. Each floor measured four and one-half acres in area and approximately 20,000 lighting fixtures were located throughout the building and situated twenty feet above the floor.

It is undisputed that the contract drawings showed the existence of the ductwork, but gave no information whatsoever with respect to the existence of the disputed fixtures. Additionally, the contract drawings provided specifically for the removal, rehanging and recircuiting of 308 lighting fixtures which were located in certain designated areas known as air handling rooms. No work thereon is in issue here, and it is pertinent to note that comprising the 308 fixtures were 144 new fixtures which were to be furnished and installed and 164 existing fixtures which were to be removed and relocated.

Prior to bidding, the subcontractor's estimator testified that he had thoroughly reviewed the detailed specification requirements and had correlated them with the work indicated on all the contract drawings. The estimated cost of the electrical work was not determined until after the estimator had visited the site. On such visit, he confirmed the view of the scope of the work gained from the prior study of the contract documents, and verified the actual count of 308 fixtures as shown on the drawings.

After the subcontract was executed, the subcontractor's project engineer visited the site to evaluate the project in terms of the labor force necessary to do the required work. He reevaluated the earlier estimate and concurred in its conclusion, including specifically that only the 308 fixtures were a contract responsibility. It is also to be noted that prior to bidding, the plaintiff's vice president had also made an inspection of the work site.

At, or shortly after commencement of the demolition work, a dispute arose when the construction engineer directed the subcontractor to remove and replace a then undetermined amount of lighting fixtures in excess of the 308 fixtures specifically portrayed on the contract drawings. The subcontractor notified the plaintiff and requested a contracting officer's decision. The subcontractor claimed that removal and replacement of lighting fixtures in any quantity in excess of the 308 fixtures noted on the contract prints was not within the intent of the contract documents.

As mentioned earlier, the subcontractor complied with the verbal order given by the construction engineer,[3] but proceeded under protest. Sometime later, the construction engineer recommended payment of the plaintiff's requested change order covering the additional

3. This term is used interchangeably with the term architect-engineer throughout this opinion.

electrical work on the basis that the work was not covered in the contract drawings or specifications.

Pursuant to a review by GSA representatives, the architect-engineer was advised by the Acting Chief, Design and Construction Division, that the work was required by the contract. The reasons advanced were that it appeared that the removal and reinstallation of the disputed fixtures which hung to the bottom of the ductwork should have been noted when a pre-bid inspection was made; that it should have been all the more apparent that the fixtures were to be reinstalled, since the ductwork was required to be removed.

The contracting officer concurred in the above decision, and notified the plaintiff that no additional payment could be justified in light of the contract provisions which adequately covered the subject work as an integral part of the contract. The Board affirmed the contracting officer's conclusion that the work was a contractual obligation. These administrative proceedings gave birth to judicial review in this court.

The plaintiff now challenges the decisions of the Board under the Wunderlich Act, 41 U.S.C. §§ 321–322 (1964). Only the administrative record is before us. On that record we discuss the two issues which in our opinion control resolution of the controversy. They are whether the contract papers required the performances of the disputed work; and whether the contract documents which were furnished were misleading and failed to give the plaintiff the benefit of superior knowledge which the defendant allegedly possessed and withheld.

The plaintiff's contractual obligations and present contentions, as well as the administrative actions, are best understood if the key contractual provisions are set forth initially.

## Section 1
## General Conditions

\*  \*  \*  \*  \*  \*

### 1–4. CONDITIONS AT SITE OR BUILDING

The Contractor shall be responsible for having ascertained pertinent local conditions readily determined by inspection and inquiry, such as the location, accessibility and general character of the site or building, labor conditions, the character and extent of existing work within or adjacent thereto, and any other work being performed thereon at the time of the submission of his bid.

\*  \*  \*  \*  \*  \*

## Section 2
## Special Conditions

2–1. SCOPE OF WORK: The work to be done hereunder includes the furnishing of all labor and materials and performing all work required for the alterations, additions, repairs and miscellaneous changes in construction of architectural, structural, mechanical and electrical work for the installation of a new air conditioning system at the United States Post Office (Main) at 30th & Market Streets, Philadelphia, 4, Pennsylvania; all as shown on Drawings 27–01 (Cover Sheet) and Drawings Nos. 27–20 thru 27–57 inclusive, and Standard Detail Drawings as listed on Drawing 27–01 as herein specified and as may be directed.

\*  \*  \*  \*  \*  \*

2–18. PROTECTION. The Contractor shall provide adequate protection for all parts of the building, and its contents and occupants wherever work under this contract is performed. All furniture, office fixtures, carpets, etc., shall be moved as may be necessary for the proper performance of the work, stored on the premises, protected and properly replaced, all as directed by the Architect or Building Superintendent.

\*  \*  \*  \*  \*  \*

2–22. EXISTING WORK. Existing work shall be cut, drilled, altered, re-

moved, or temporarily removed and replaced as necessary for the performance of the contract. Work that is replaced shall match similar existing work. However, unless otherwise provided by the drawings or specifications, no structural members shall be cut or altered without authorization of the Contracting Officer. Work remaining in place which is damaged or defaced by reason of work done under this contract shall be restored equal to its condition at the time of the award of the contract.

\*　\*　\*　\*　\*　\*

2–59. INTERRUPTIONS TO ELECTRICAL SERVICE. As far as possible or practical all electrical work shall be done without interruptions to building services and activities. \* \* \*

2–60. MAINTENANCE OF ELECTRICAL SERVICE. All building electrical facilities are to be maintained in service during the construction period, except where approval of interruptions are obtained. Where it is necessary to provide temporary arrangements for maintenance of existing services used in new work, all necessary equipment and wiring for this purpose shall be installed by the Contractor. These temporary facilities shall be removed as soon as it is practical to restore the permanent services.

\*　\*　\*　\*　\*　\*

2–66. VISIT TO THE SITE. Prior to the submission of bids, it is recommended that all bidders visit the site to familiarize themselves with existing building conditions and the extent of work being performed under existing contracts. The bidders shall contact the Building Superintendent to obtain permission to inspect the building, and the project drawing for the above mentioned contracts. The Government will not be responsible for the bidder's failure to properly familiarize himself with conditions that will exist during the life of this contract.

## Section 4

### Removals, Demolition and Miscellaneous Repairs

\*　\*　\*　\*　\*　\*

4–3. It shall be the Contractor's responsibility to investigate and determine building conditions at the site so as to familiarize himself with the nature of all materials involved in the course of his work.

\*　\*　\*　\*　\*　\*

4–25. TEMPORARY EQUIPMENT REMOVAL: Lighting fixtures and appurtenances, mechanical equipment and appurtenances, which are removed by the Contractor for his convenience during demolition shall be reinstalled in original location as approved by the Construction Engineer.

4–26. Damage caused by the Contractor during the course of removal, shall be repaired or replaced as directed by the Construction Engineer, all at the Contractor's Expense.

\*　\*　\*　\*　\*　\*

## Section 25

### Air conditioning and Ventilation

\*　\*　\*　\*　\*　\*

25–75. LIGHTING FIXTURES: Lighting fixtures and appurtenances which are removed by the Contractor for his convenience or to facilitate the installation of ducts, piping, or equipment shall be reinstalled in original location by and at the expense of this Contractor. Where these or other lighting fixtures are reduced in effectiveness by the installation of ducts, piping, or equipment, such fixtures shall be reinstalled in or removed to a new location as approved by the Construction Engineer, all at the Contractor's expense except where relocation of fixtures, such as in the areas of the new air handling rooms, is specifically included and called for on the plans or in the specifications pertaining to electrical work.

\*   \*   \*   \*   \*   \*

## Section 27
## Electrical Systems

### 27-1. SCOPE OF WORK:

(a) The work covered by this section of the specifications consists of furnishing all labor, equipment, supplies, and materials and in performing all operations including cutting, channeling, chasing necessary for the installation of the complete electrical systems in strict accordance with this section of the specifications and the applicable drawings.

(b) All items of labor, material and equipment not specifically mentioned herein or shown on the drawings, but incidental to or required for the complete electrical installation and proper operation of the work, shall be furnished as if called for in detail by the specifications or drawings.

\*   \*   \*   \*   \*   \*

### 27-61. REMOVAL AND RELOCATION OF EXISTING ELECTRICAL EQUIPMENT:

(a) The Contractor shall be responsible for the removal of and/or location of all existing electrical equipment, conduit and wiring necessary for the installation of the air conditioning system. This shall include removal of all necessary equipment and wiring for the construction of all air handling rooms and the new air conditioning equipment room on the fifth floor. The existing fans and mechanical equipment to be removed are shown on the mechanical demolition drawings. The Contractor shall remove all associated electrical equipment, conduit and wiring.

\*   \*   \*   \*   \*   \*

(e) Existing electrical work which will not be rendered obsolete and which will be disturbed due to construction changes required by this contract shall be restored to operating conditions as required and/or as directed by the Construction Engineer. Outlets from which fixtures, switches, or receptacles are removed and not reused shall have wires insulated and shall be provided with blank covers.

\*   \*   \*   \*   \*   \*

### Instructions to Bidders

1. *Explanation to Bidders.* Any explanation desired by bidders regarding the meaning or interpretation of the drawings and specifications must be requested in writing and with sufficient time allowed for a reply to reach them before the submission of their bids. Oral explanations or instructions given before the award of the contract will not be binding. Any interpretation made will be in the form of an addendum to the specifications or drawings and will be furnished to all bidders and its receipt by the bidder shall be acknowledged.

2. *Conditions at Site of Work.* Bidders should visit the site to ascertain pertinent local conditions readily determined by inspection and inquiry, such as the location, accessibility and general character of the site, labor conditions, the character and extent of existing work within or adjacent thereto, and any other work being performed thereon.[4]

\*   \*   \*   \*   \*   \*

In light of the above provisions, the plaintiff's principal argument is that the plain language of the contract did not require it to perform the disputed work. Its position is that the fixtures in question could not conceivably be considered as removed for the "convenience" of the plaintiff as section 25–75 was interpreted by the Board since the fixtures were physically attached to the ductwork necessitating their removal. Hence, no convenience was involved. The clear import of the term "convenience" in sections 4–25 and 25–75, plaintiff maintains, was to indicate that it was to have an option or some discretion or choice concerning fixture removal. Plaintiff attempts to support this construction by offering the analysis that the mandate to reinstall fixtures which have been

---

4. The contract also contained the standard "Changes" and "Disputes" articles.

removed for the convenience of the contractor "in original location" would have been impossible of accomplishment as the existing ductwork was itself removed.

The observation should be made that a total of 4,887 fixtures in addition to the 308 fixtures depicted on the drawings were removed. The original claim embraced all this additional fixture work, but the subcontractor eventually accepted the government's position that 2,489 fixtures were removed for the contractor's convenience. These fixtures, however, were not attached to the ductwork. In fact, now the plaintiff readily admits that relocation and reinrt llation of fixtures at its own expense was not limited to areas specified on the drawings. But as plaintiff interprets the term "convenience" only those situations where the plaintiff could perform the contract work without moving any fixtures were encompassed by the "convenience" provisions. In other words, plaintiff argues that only 308 fixtures were to be removed as part of the contract work and it was to be compensated for all other fixture removals except those removed for its convenience as that term is interpreted by plaintiff.

It, therefore, becomes a crucial part of this case to determine whether the word "convenience" when read in context in the appropriate provisions always must involve an element of choice on the part of the contractor, or whether it may mean "necessary" in appropriate situations.

■ Before commencing our legal analysis, it must be remembered that the Board's factual conclusion that the plaintiff reasonably should have known that the disputed fixtures were affixed to the ducts and provided with essential wire connections is supported by substantial evidence and, therefore, immunized from attack here.

■ On remand, the government produced three witnesses who were employees of its contract architect-engineer during the design and construction of the project. Uniformly these witnesses testified that the disputed light fixtures were attached to the ducts in the ceiling and were plainly visible. Although there was contradictory testimony presented by the plaintiff's witnesses, the Board, as trier of the facts was vested with discretion to accept the testimony of defendant's witnesses and to reject that of plaintiff's witnesses. Dittmore-Freimuth Corp. v. United States, Ct.Cl., 390 F.2d 664, decided February 16, 1968; Chris Berg, Inc. v. United States, Ct.Cl., 389 F.2d 401, decided January 19, 1968. The plaintiff offers us no reason to overturn the Board's preference.

■ Certainly, it would have been much better for us on judicial review if the Board had plainly stated that plaintiff should have known that the fixtures in question were wired through the ducts, rather than "provided with essential wire connections." However, in the circumstances of this case, we conclude that the Board intended by its phraseology to mean that the plaintiff should have known that the fixtures were wired through the ducts. First, we note that the Board in a brief opinion twice set out the question returned to it in accurate fashion. Secondly, it directed specific attention to a series of photographs introduced by the plaintiff at the first hearing which clearly revealed that light fixtures were attached to the duct bottoms with the wiring in some instances turning into the duct. Finally, both parties on brief have without hesitation assumed that the Board concluded that the plaintiff should have known that the wiring ran through the ducts. Cf. Sundstrand Turbo v. United States, Ct. Cl., 389 F.2d 406, decided January 19, 1968. Furthermore, the only attack plaintiff makes on the administrative finding is worded in terms of the magnitude of the work area involved and only that "the Board's finding as to the wiring is wholly unreasonable." These generalities are insufficient to overturn the Board's factual determination. Id. 389 F.2d 422.

I

We determine that the contract when read in its entirety comprehended the performance of the disputed work. This conclusion is not based merely on the reading of a single contract provision, but rather upon agreement with the defendant's position that in consideration for the fixed fee of $2,389,000, plaintiff was required to do and accepted the risk and expense of doing all the installation work that was necessary to complete the project. See Blauner Const. Co. v. United States, 94 Ct.Cl. 503, 510–511 (1941). As the work concededly required removal of the ductwork to which the disputed fixtures were attached, removal of those fixtures was by implication an indispensable part of the plaintiff's contractual obligation. See Sacramento Navigation Co. v. Salz, 273 U.S. 326, 329, 47 S.Ct. 368, 71 L.Ed. 663 (1927).

The following discussion of specific contract provisions does nothing more than shore up the result we have already reached.

As noted earlier, section 2–1 of the Special Conditions required the performance of all work necessary for the installation of the air-conditioning system. Section 2–18 then provided for the removal, storage, and reinstallation of all office fixtures "as may be necessary for the proper performance of the work, * * *." Existing work, pursuant to section 2–22, was to be "temporarily removed and replaced as necessary for the performance of the contract." It was further provided by section 4–26, that any damage occasioned by the removal was to be repaired or replaced "all at the Contractor's Expense."

These provisions alone would seem to command the work which is the subject matter of this suit, but there is more to be considered.

With respect to the electrical work involved in suit, section 2–59 warned that as little interruption as possible to building services and activities "shall" be caused by the performance of the required electrical work. Furthermore, all existing electrical facilities were to be maintained in service except where interruptions were granted. (Section 2–60.) These provisions certainly required the plaintiff to take note of the existing electrical conduits to cause as little interruption as possible to their functioning.

Other sections set out in complete text, supra, merely have a cumulative effect upon what we have indicated was the contractor's responsibility. Certainly, the knowledge that approximately 20,000 fixtures existed in the subject building, when coupled only with the contract provisions summarized above, would have alerted a bidder to make a thorough site investigation to ascertain the scope of the work involved.

Now, we will consider the particular provisions which the parties have stressed. As indicated earlier, section 25–75, which provided that lighting fixtures removed for plaintiff's convenience or to facilitate installation of ducts, piping or equipment should be reinstalled in original locations by and at plaintiff's expense, is of prime importance. That section further provided that where these or other lighting fixtures were reduced in effectiveness by the installation of ducts, piping or equipment, such fixtures shall be reinstalled in, or removed to a new location as approved by the construction engineer, all at plaintiff's expense except where relocation of fixtures such as in the areas of the new air handling rooms was specifically included and called for on the plans or in the specifications pertaining to electrical work.

To repeat, it is plaintiff's contention that nothing in this section should be interpreted to require the removal and installation at plaintiff's expense of fixtures other than those which are shown in the plans or referred to in the specifications, as, for instance, the 308 fixtures which concern the air handling rooms.

Plaintiff's interpretation is erroneous for the plain language of the section requires removal and reinstallation of fix-

tures reduced in effectiveness by the installation of ducts or other equipment. Clearly, these fixtures are not shown on the drawings, yet their removal is required.

■ All this sets the stage for an interpretation of the meaning of the word "convenience" as employed in this same section. We believe that the word "convenience" as used in this contract may mean "necessary" in appropriate circumstances. In other words, the fixtures in dispute here, although their removal was required, were embraced by the provision requiring removal and reinstallation at the contractor's expense. While technically the fixtures could not be reinstalled in their original locations because the ducts themselves were removed, again we agree with the defendant that it was the geographical location of the fixtures themselves rather than the location of the ductwork which is significant.

■ We note also that the word "convenience" in the law of government contracts is a term of art. For instance, the clause allowing terminations for the convenience of the government may be utilized although the termination is necessary, i. e., where the subject matter of the contract is destroyed.

Furthermore, we are not looking at the "convenience" provision in isolation, but rather against the background of all the other contractual provisions involved herein. We look in vain for any statement or agreement or even intimation that any reimbursable obligation in favor of plaintiff was entered into concerning removal and reinstallation of the fixtures in dispute. Plaintiff asks that the contract be so construed as to create a right in favor of one of the parties in conflict with the natural significance of the contract language. The meaning plaintiff claims for the word "convenience" cannot be adopted without departing from the intention of the parties as manifested by the terms of the contract and the documents forming part of it, and such meaning cannot moreover be sanctioned

without doing violence to the context of the contract.

Nothing outside the four corners of this contract changes our conclusion. Very briefly we believe that the opinion of the architect-engineer, upon which plaintiff relies heavily, is simply incorrect. With everything considered, the contract is not even ambiguous.

As we indicated earlier, the subject matter of this project, without any specific site inspection provisions would have alerted a bidder to make a careful site investigation. But that is not this case. Involved here are three specific admonitions to investigate and determine building conditions at the site. (Sections 1–4, 2–66 and 4–3.) As the Board stated, this case is different from many others where a site investigation clause assumes importance, in that here plaintiff was not confronted with only a boilerplate inspection provision concealed in a printed form, but was also enjoined specifically in two particular specification sections to investigate and determine building conditions.

Plaintiff asserts, however, that ascertaining the scope of the work was not a purpose of these sections, but they only were intended to alert the bidders to the general character and accessibility of the building. This was due to the fact that post office employees had to perform their functions during performance, and also consideration had to be given to the performance of another contract going on simultaneously with the performance of the instant contract.

It is clear, maintains the plaintiff, that these site inspection provisions were not of a nature as to require plaintiff to appreciate that the work now in dispute was intended as part of its contract. The plaintiff contends that the contract provisions calling for site inspection do not affect its interpretation and did not require the disputed work. It relies upon Kayfield Const. Corp. v. United States, 278 F.2d 217 (2d Cir. 1960). In that case the essence of plaintiff's obligation was to strengthen and level wooden trusses on two floors of a building in the Brook-

lyn Navy Yard. As the work progressed, both latent and surface obstructions interfered with the work requiring the employment of various trades not mentioned in the specifications which were otherwise precise in detailing the labor needed. The court determined that the contract as estimated and bid by plaintiff did not consider and would not have required employment of the additional trades. Cautionary phrases were held to be insufficient to alert a trusting bidder that more was involved than shown in the specifications. Judgment, therefore, was entered in favor of the plaintiff for the additional work involved.

It is apparent that plaintiff's reliance is misplaced. From a casual reading of the cited case, it is readily discernible that it did not involve a situation where the work, as here, was contemplated and anticipated by the contract documents. Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914), also mentioned by plaintiff does not alter our discussion thus far.

We are of the opinion that plaintiff's concept of the purpose for the site inspection is far too narrow. We have determined that a primary purpose of the site inspection was to ascertain what obstacles there would be toward the performance of the contract. To this end, the mere presence of 20,000 fixtures could reasonably be expected to interfere with the contract work such as the removal and installation of ducts. The several provisions concerning site inspection were inserted, we believe, to emphasize to plaintiff the magnitude of the project area involved and its total commitment under the contract.

■ Indeed we have indicated just recently that the proper reading of a contractual provision may well rest upon the nature of the clause—that is, a boilerplate clause or one specifically tailored for the particular project. Southwest Welding & Mfg. Co. v. United States, 373 F.2d 982, 988, 179 Ct.Cl. 39, 48 (1967). In this contract, the site inspection provisions were not inserted routinely as a matter of course, as we already have stated. Accordingly, our expanded view of the purpose of a site inspection, in contrast to plaintiff's view, in the circumstances of this case is entirely permissible. Therefore, plaintiff as the Board found, should have known about the fixture problem and likewise should have known that defendant would not pay for this work, as no provision authorized compensation. In the circumstances of this case, it is safe to state that the defendant wished to leave the matter open to the independent investigation of the plaintiff as it omitted any positive assertion with respect to the disputed fixtures. See Hollerbach v. United States, supra, 233 U.S. at 172, 34 S.Ct. 553.

■ The Board found that plaintiff's inspection was very limited and rather casual. The settled rule in cases of this type is that a contractor is bound by what it would have discovered if it had adequately investigated the site. S. S. Mullen, Inc. v. United States, Ct.Cl., 389 F.2d 390, decided January 19, 1968; Hunt & Willett, Inc. v. United States, 351 F.2d 980, 985, 168 Ct.Cl. 256, 265 (1964); S.T.G. Const. Co. v. United States, 157 Ct.Cl. 409, 415–416 (1962). It follows that no claim arises where a contractor sustains a loss through its own negligence in not examining the site and has failed to take into consideration conditions which actually existed and which had been called to its attention by a warning to visit the site. Blauner Const. Co. v. United States, supra; S.T.G. Const. Co. v. United States, supra.

In conclusion, defendant made no change constructive or otherwise. It simply stood pat on the language of the contract documents agreed to by the parties.

II

Plaintiff argues in the alternative, that if the defendant intended to require performance of the disputed work then it furnished the plaintiff with misleading drawings which misrepresented the amount of work required and that fur-

thermore, the defendant had superior information which it withheld from the plaintiff. This deception was caused, asserts the plaintiff, since the defendant required almost identical work with respect to 308 fixtures which work was shown on the drawings. Plaintiff argues that this alleged act of misleading was aggravated and made more culpable by the fact that the defendant knew of the problem and had provided another contractor with complete drawings indicating the disputed type of work in detail, but did not furnish the plaintiff with equivalent drawings for its project. Finally, plaintiff assumes, *arguendo*, that the disputed fixtures were visibly attached to the ducts, and ~ven this, contends plaintiff, does not excuse the defendant from the responsibility of providing for the work required with respect to the fixtures in question, or of specifically warning bidders to investigate the site for the purpose of determining whether the contract embraced extra work not indicated in the documents.

■ In the first place, this record conclusively demonstrates that the plaintiff knew or should have known of the facts central to this controversy and, therefore, at least one prerequisite essential to the plaintiff's recovery on a misrepresentation theory is missing. See J. A. Jones Const. Co. v. United States, Ct.Cl., 390 F.2d 886, decided February 16, 1968.

We also conclude that the defendant was warranted in assuming that plaintiff was aware that the disputed fixtures were attached to and wired through the ductwork. It follows, that in the court's view, the defendant was not remiss in failing to warn plaintiff of what it should already have known prior to contracting, and what the contract should have forewarned it was more a reality than even a distinct possibility.

We will, however, dispose separately of each prop utilized by plaintiff to support its alternative contention. With respect to the 308 fixtures shown specifically on the drawings in the area of the new air handling rooms, it is significant that those fixtures were either new fixtures or fixtures required to be relocated as we mentioned earlier. Moreover, the specified area as indicated consisted of new rooms. The work was not, as plaintiff suggests, almost identical. Certainly there was no need to furnish drawings for fixtures which would be required to be removed in order to perform the contract work, and which were to be reinstalled in their original locations.

As far as the simultaneous performance of another contract is concerned, which is referred to as the mail flow contract, and for which the drawings clearly indicated the fixture work to be performed, a satisfactory explanation for this difference was provided by government counsel at oral argument. The mail flow project actually incorporated two distinct contracts. It was essential, therefore, that each contractor be provided with ample directions to indicate the division of labor involved. Government counsel stated that had the mail flow operation been one project as the instant installation contract, likewise, the drawings would not have revealed the fixture work.

■ Beyond question, the government did not furnish plaintiff with all the knowledge it possessed, but the failure to furnish said information did not mislead the plaintiff and thus, it was not damaged thereby. See J. A. Jones Const. Co. v. United States, supra, 390 F.2d at 893 and n. 15; L. M. Jones Co., Inc. v. United States, 178 Ct.Cl. 636, 651 (1967); Leal v. United States, 276 F.2d 378, 384, 149 Ct.Cl. 451, 462 (1960). A bare withholding is not enough to make out a case. The plaintiff must show that it was in fact misled by the withholding of information. If the plaintiff knew or should have known of the condition complained of, then, it cannot be said that it was misled. Cf. National Concrete & Foundation Co. v. United States, 170 Ct.Cl. 470, 476 (1965).

■ This was not a situation where the defendant alone had superior knowl-

edge of a material fact which it withheld from the plaintiff, and which it knew plaintiff required to intelligently appraise contract expenditures. The site investigation provisions preclude a claim for nondisclosure or misrepresentation where, as in this case, the alleged unknown information would have been obtained through the inquiries contemplated by those provisions. J. A. Jones Const. Co. v. United States, supra, 390 F.2d at 888, n. 6; Hunt & Willett, Inc. v. United States, supra, 351 F.2d at 985, 168 Ct.Cl. at 264–265.

It is the plaintiff's position, however, that the defendant should not be able to shift the economic burden of doing work not clearly called for by its plans and specifications to the plaintiff on the basis of site inspection provisions which are not designed to determine the accuracy of the plans and specifications. For this proposition, plaintiff sets forth the facts both in Ruff v. United States, 96 Ct.Cl. 148 (1942); and in Albert & Harrison, Inc. v. United States, 68 F.Supp. 732, 107 Ct.Cl. 292 (1946), cert. denied, 331 U.S. 810, 67 S.Ct. 1199, 91 L.Ed. 1830 (1947).

In *Ruff,* which involved a contract for the construction of a post office building, the plaintiff's claim included the cost of excavating a large area which the court concluded had been misrepresented on the drawing legend as having already been excavated before the contract was executed. This error in the drawings, it was stated, induced a careless site inspection. In such circumstances, the court held that the consequences of the erroneous and misleading legend were not removed by pointed warnings such as "[t]he accuracy of data given on this drawing is not guaranteed," and plaintiff was entitled to recover the cost of the excavation involved.

In *Harrison,* plaintiff sued to recover extra costs upon an allegedly misleading drawing in connection with its contract for the renovation of three buildings. Prior to the renovation in the two buildings with which the suit was concerned, 74 spaces in each building were occupied by doors. The planned renovation was to consist of bricking up all of these doors except one or two in each bay. The drawing relating to the third building indicated intelligibly all the existing openings and all proposed openings to be left in that building. The drawing which concerned the two buildings in suit erroneously indicated that the doorway spaces for the most part were already occupied by brick. This led plaintiff to compute the amount of new brick work required as being very small and plaintiff made its bid accordingly. Even though plaintiff could have easily visited the site, and did not do so, the court determined that plaintiff was entitled to recover since the specifications and drawings, in conjunction, were misleading and misled plaintiff into formulating a bid which it would not otherwise have made.

These cases are clearly distinguishable from the present as the instant litigation does not involve erroneous or misleading drawings and specifications as was true of the above-cited cases. Furthermore, the intent of the site inspection provisions herein was fully explored in Part I of this opinion. We determined that the facts concerning the disputed fixtures could reasonably have been discovered through the plaintiff's own inspection and investigation of clues illuminated by the contract documents. Moreover, the Board found that the plaintiff reasonably should have known that the disputed fixtures were affixed to the ducts and provided with essential wire connections. Under these circumstances, the plaintiff could not have been misled by the drawings and specifications.

In the final analysis, despite any purported fault on the part of the defendant, it was the plaintiff's own negligence which caused its loss. In the circumstances of this case, the plaintiff is precluded from recovering.

Accordingly, the plaintiff's motion for partial summary judgment is denied, the defendant's motion for summary judgment is granted, and the petition is dismissed.