**PETROCHEM SERVICES,
INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**No. 87–1382.**

United States Court of Appeals,
Federal Circuit.

Decided Jan. 26, 1988.

Ronald Van Stockum, Jr., Louisville, Ky., submitted for appellant.

Jeanne A. Anderson, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., submitted for appellee. With her on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief was Ken Homick, Asst. Counsel, Dept. of the Navy, of counsel.

Before ARCHER, Circuit Judge, NICHOLS, Senior Circuit Judge, and MAYER, Circuit Judge.

NICHOLS, Senior Circuit Judge.

Petrochem Services, Inc. appeals the decision of the Armed Services Board of Contract Appeals [ASBCA or board], ASBCA No. 33105, 87–1 BCA (CCH) ¶ 19,597 (1987), holding that the government discharged its duty to disclose superior knowledge through oral representations made to appellant at the time of on-site inspection. We vacate the ASBCA's judgment denying Petrochem's appeal and remand.

## Issues

The issues raised by the parties are twofold. First, was the government's duty to disclose superior knowledge legally discharged by the government's oral representations to Petrochem? Second, was the ASBCA's decision arbitrary, capricious, so grossly erroneous as to imply bad faith, or not supported by substantial evidence so as to require reversal and remand?

## Background

On January 29, 1982, oil spilled from a storage tank being filled at the Great Lakes, Illinois Naval Base. The tank:

is a part of the facility's steam generation capability and provides back-up fuel * * *. The tank is constructed of steel and is approximately 60 to 70 feet in diameter, 40 feet high and contains perhaps as much as a half million gallons of fuel oil. The tank sits in the middle of a rectangular containment area approximately 80 × 100 feet in size. The floor

of the containment area is covered with about a one foot thickness of pea gravel. The containment area is * * * sized to contain all of the oil which might be in the storage tank at any given time in the event of a catastrophic rupture.

(Appellant's App. at 3.)

The Navy determined that the oil had to be removed and that bids should be taken from contractors to perform the operation. In order to assist those contractors interested in bidding, Mr. Gary Smith, Supervisor of Steam Production at the Navy's Public Works Center, drafted technical specifications for the cleanup. The government's engineering department ascertained that 21,076 gallons had spilled, but Mr. Smith did not mention this figure in the technical specifications.

The contract, No. N62472–82–C–6147, was awarded to Petrochem on May 18, 1982. Prior to the contract award, Petrochem sent a representative, Mr. Edward Vehrs, to the facility to gauge how much oil spilled and required removal. A visual inspection around the tank revealed water and oil floating in varying degrees upon the surface of the water. The pea gravel bottom of the tank was not visible to anyone simply looking at the tank.

At the on-site inspection, Mr. Vehrs estimated that roughly 6,000 gallons of oil had to be removed. The level of water within the concrete barrier and the weather conditions in March prevented anyone from seeing exactly how much oil had spilled. Mr. Smith testified, however, that in a brief exchange, he said to Mr. Vehrs that the actual amount spilled was closer to 21,000 gallons. The government well knew this by the amount that had disappeared from its inventory. It was not found, and is not clear, that the statement was made in such a way that Vehrs knew or could be charged with knowledge that it was an official, definitive disclosure of superior knowledge rather than an off-hand (or even considered) estimate by a government employee who, for all Vehrs knew, may have been no better qualified to estimate than Vehrs. It is not clear how well Smith communicated. Vehrs either did not hear it, heard it but thought Smith was guessing, or heard it but did not understand. Regardless of the disparity in numbers, neither party subsequently communicated with the other in writing to verify the exact amount of oil in question. At trial, Mr. Vehrs was unavailable to testify regarding his conversation with Mr. Smith and the board relied on Mr. Smith's testimony.

When Petrochem attempted to perform the contract, it discovered that its estimate was off by roughly 15,000 gallons; a material difference which would have been reflected in Petrochem's bid, if it had known the correct amount of oil to be removed. The removal process occurred during June–August, 1982. The warmer weather caused the oil in the pea gravel to seep out and float up to the surface, something which did not occur on March 22, 1982, when Mr. Vehrs made his on-site inspection. Petrochem performed the contract, ultimately removing 21,401 gallons of oil from the tank.

After the cleanup, Petrochem submitted a claim to the contracting officer for an equitable adjustment in the amount of $27,421.13, based on the government's failure to disclose superior knowledge. The contracting officer denied Petrochem's request and Petrochem filed an appeal with the ASBCA pursuant to 41 U.S.C. § 605(c)(5). On January 5, 1987, ASBCA upheld the contracting officer's denial of an equitable adjustment. After reconsideration, the ASBCA affirmed the January 5, 1987, decision on May 14, 1987. This appeal ensued raising questions of failure to disclose material superior knowledge and changed conditions.

*Opinion*

I. *Duty to Disclose Superior Knowledge*

■ A veritable gold mine of circuit caselaw exists defining the government's duty to disclose superior knowledge on contracts when equitable adjustment claims under contract clauses or breach of contract claims are raised. In either type of claim, the doctrine of superior knowledge requires approximately the same elements

to be satisfied. *See, e.g., Petrofsky v. United States,* 616 F.2d 494, 222 Ct.Cl. 450 (1980), *cert. denied,* 450 U.S. 968, 101 S.Ct. 1488, 67 L.Ed.2d 618 (1981) (breach of contract); *Hardeman–Monier–Hutcherson v. United States,* 458 F.2d 1364, 198 Ct.Cl. 472 (1972) (equitable adjustment); *H.N. Bailey & Associates v. United States,* 449 F.2d 376 (Ct.Cl.1971) (equitable adjustment); *Wm. A. Smith Contracting Co. v. United States,* 412 F.2d 1325, 188 Ct.Cl. 1062 (1969) (equitable adjustment); *Helene Curtis Industries, Inc. v. United States,* 312 F.2d 774, 160 Ct.Cl. 437 (1963) (breach of contract). The disclosure of superior knowledge doctrine applies in situations where:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

*American Shipbuilding Co. v. United States,* 654 F.2d 75, 79, 228 Ct.Cl. 220 (1981) (breach of contract); *see also Max Jordan Bauunternehmung v. United States,* 10 Cl.Ct. 672, 678 (1986), *aff'd,* 820 F.2d 1208 (Fed.Cir.1987) (equitable adjustment).

The record reveals that the government knew that over 21,000 gallons spilled into the containment area and required cleanup. The government possessed a vital fact that affected the performance costs of the contract and appellant undertook to fulfill the contract absent these specific and essential elements. These costs would be reflected in any contractor's bids.

Second, the board found that Mr. Gary Smith of the Navy's Public Works Center advised Mr. Vehrs, the appellant's representative, that roughly 21,000 gallons of oil spilled. From this an inference can be drawn that appellant needed to be given the information. The precise number of gallons spilled was omitted from the documents provided the bidders. The missing oil amount was recorded, however, in the Navy's monthly inventory reports. The board stated that the government's failure to *effectively* disclose the information would have resulted in the government's breach of contract, but the government would not be liable for failing to provide information readily available to appellant from other sources. *H.N. Bailey,* 449 F.2d at 382–83.

In this instance, for an uninformed bidder, visual inspection would have represented the sole method of obtaining the number of gallons spilled, since *none* of the government's documents released to the bidders reflected the amount of oil to be cleaned away. But, as the board noted in its opinion, "a site inspection would not help them evaluate the scope of work required," 87–1 BCA at 99,127, thus the government bore the burden of providing the contractor with knowledge the contractor did not nor could not have.

■ Third, the ASBCA's January 5, 1987, opinion unequivocally states that, based on the testimony at trial, appellant's representative, Mr. Vehrs, was advised of the number of gallons of oil lost by the Navy when he was escorted on the site inspections. One of the elements of the doctrine of superior knowledge requires that the contractor, in order to invoke the doctrine, not be put "on notice to inquire" into any contract specification. *American Shipbuilding Co.,* 654 F.2d at 79. Placing a party on notice shifts the burden to that party to inquire further. It is undisputed that appellant was orally told by Mr. Smith the amount of oil lost. As noted above, no findings were made by the board regarding whether Mr. Vehrs believed Mr. Smith's estimates, and if not, why not. Appellant should have been placed on notice to inquire into the validity of that figure when Mr. Vehrs' visual inspection of the site produced an estimate of 6,000–7,500 gallons of oil. This obvious numerical difference from Mr. Smith's estimate would perforce have a substantial impact on any bid appellant provided. Mr. Smith's statement to Mr. Vehrs, if understood, should have caused inquiry by appellant to verify the

numerical disparity between Mr. Smith's estimate and Mr. Vehrs' estimate.

Apart from the legal requirements as stated in circuit precedent, common sense dictates that any vast difference in contract requirements, be examined thoroughly. In essence, appellant fails to satisfy the burden of inquiry shifted to him by Mr. Smith's statement. *Max Jordan,* 10 Cl.Ct. at 678. *See also LaPointe Industries, Inc.,* 78–2 BCA (CCH) ¶ 13,444 (1978).

 Lastly, the government provided appellant the essential information in an oral representation. No caselaw known to this court, or presented by the parties, exists regarding the question of whether the government may discharge its duty to disclose superior knowledge through oral representations, but we agree with the board's determination that "[w]hile the most customary, perhaps best, way of providing information to bidders is through the written bidding documents, adequate disclosure can be made in other ways." 87–1 BCA at 99,128. The four elements cited in *American Shipbuilding* indicate that *no* written requirement is explicitly or implicitly imposed on the government; that is, there is no express or implied rule that the government must provide its contractors information *in writing* in order to discharge its duty to disclose. If the government is not held liable for failing to warn contractors of specific conditions noticeable in a site inspection, *Ambrose–Augusterfer Corp. v. United States,* 394 F.2d 536, 184 Ct.Cl. 18 (1968), then the government should not be held liable for making an effort to disclose superior knowledge, albeit, not in the best fashion. The court questions the board's decision "that appellant had been appropriately advised of the exact scope of the work." 87–1 BCA at 99,128. This would only be true if Mr. Smith had reason to believe he had made the disclosure the law calls for, and had communicated it effectively.

 In any instance where the trial tribunal finds that oral communications were made, we now hold the government may not satisfy its duty to disclose superior knowledge unless it shows that the communication was not only made, but also heard, and understood, actually or apparently. The government may satisfy its burden by showing, either through conversations held between the contractor and government agent or other such evidence, that it reasonably believed the contractor was aware of the communication and understood its import. There is no practical way the government can know for sure that someone understands. If it has done all it can to get the information out loudly and clearly, it has done all it can. Comprehension is up to the recipient. In the instant case, the board found that the statement was made by Mr. Smith to Mr. Vehrs, but made no findings regarding whether Mr. Vehrs heard or understood the statements or whether Mr. Smith thought he had. Mr. Smith's testimony, upon which the board relied, tells us:

Q: Is it your testimony today, sir, so that the record will clearly reflect that testimony, that the day that Mr. Vehrs was there you told him that there was 21,000 gallons that had been spilled from that tank?

A: I didn't specifically tell him that there were 21,000 gallons. There is some point in time, either on that first date or on subsequent meetings thereafter that I think I remember Ed making the comment that he estimated 6,000 gallons of oil being there. I told him our calculations, and I am sure it was on the first meeting, I thought, showed that we had lost 21,000 gallons of oil and that oil was probably in that berm to be cleaned.

(Appellee's App. at 5.)

The testimony continues:

Q: But you knew that the 6,000 gallons represented by Ed Vehrs was a mistake?

A: I felt that it was a mistake and I told him so.

(Appellee's App. at 6.)

The testimony is quite clear that the statements which Mr. Smith alluded to were in fact made and the board so found. However, *none* of the testimony or evidence in the record states that Mr. Vehrs heard and

understood Mr. Smith's statements or that Mr. Smith so supposed.

As to whether Mr. Vehrs understood Mr. Smith's communication, the following colloquy is instructive:

Q: At the time of your inspection, or the inspection by Petrochem personnel, they looked at the site and they did some preliminary calculations, and they went up to you, Gary Smith, and they said, "We think there are 6,000 gallons down there," is that right?

A: Yes, I remember that; yes, sir.

Q: And it is your testimony today that you said, "Well, there is probably more like 21,000 gallons," is that right?

A: Most definitely.

Q: Are you sure you said that?

A: Absolutely sure.

Q: That you told them 21,000 gallons?

A: Yes, sir.

Q: Did he say then, "Okay, I'll revise my estimate up to 21,000"?

A: I don't know what he said then. He really seemed to believe that there was just 6,000 gallons of oil in the tank.

Q: When he left your company that day, he left thinking there was a 6,000-gallon spill clean-up there?

A: I don't know what he left thinking.

(Appellant's App. at 38 and 29)

The record abundantly reflects that it is *unclear* whether Mr. Vehrs understood or even heard Mr. Smith's estimate. Certainly the record is consistent with a view that he did not. The government, to prevail, should present further evidence indicating that Mr. Vehrs absorbed, digested, and comprehended the import of the figure Mr. Smith mentioned at the site inspection, whether or not he agreed with it; or at least that Mr. Smith supposed he had successfully communicated the information.

■ The court concludes that the government bore the burden to provide appellant with the information regarding the number of gallons of oil lost. The board's determination that appellee so provided the information is sufficient to establish the government's making of a statement, but insufficient on the facts to find that the government's duty to disclose superior knowledge was discharged. Once the government advised appellant that 21,000 gallons of oil had been lost, and the number of gallons estimated by appellant varied tremendously from the government's assessment, the burden shifted to appellant to inquire further in order to verify this crucial contract specification. But the government must prove that appellant had been put in a position to realize the burden had shifted. That could be accomplished if the government presents evidence that appellant heard and understood the oral representations.

In light of the court's establishment of the government's duty to present evidence at trial either that the oral communication was made, heard, and understood, or that it had done its best to achieve this result, the present suit is remanded to the ASBCA to determine whether Mr. Smith's communication was heard and understood by Mr. Vehrs and, if not, why not. Any finding so made may affect the outcome of the case and the ASBCA's opinion should reflect any impact the findings would have on the outcome.

II. *Standard of Review*

The issue of this court's standard of review is not reached in light of the court's remand to the ASBCA for additional findings of fact.

VACATED AND REMANDED.