**AEROJET–GENERAL CORPORATION
and Aerojet-General Ship-
yards, Inc.**

v.

**The UNITED STATES.**

No. 332–67.

United States Court of Claims.

Oct. 13, 1972.

J. Franklin Fort, Washington, D. C., attorney of record, for plaintiffs; William K. Bachelder, El Monte, Cal., Richard S. Salzman, Stephen F. Eilperin and Kominers, Fort, Schlefer & Boyer, Washington, D. C., of counsel.

Sheldon J. Wolfe, with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

DAVIS, Judge: *

In July 1962 Gibbs Shipyards, Inc. contracted with the Maritime Adminis-

---

* We reach the same result through a partially different road than, and borrow from the opinion of, Trial Commissioner C. Murray Bernhardt.

tration to construct two oceanographic survey ships of an advanced type—the *Oceanographer* and the *Discoverer*—to be used by the Coast & Geodetic Survey. The second of the two vessels was optional, the option being exercised by Maritime in November 1962, along with an amendment providing for the installation in each vessel of "central engine room control", an advanced form of machinery plant automation. The contract was further amended in March 1963 to include the installation in each vessel of a computer (instead of a less sophisticated data logger added to the contract by the November 1962 amendment) to monitor the central engine room control, and to report scientific data assembled by the oceanographic research equipment on each vessel. The contract price with these additions was $14,390,928.

In May 1964 plaintiff,[1] with no prior shipbuilding experience but with ample experience in complex engineering fields, bought Gibbs and, with Maritime's approval, assumed Gibbs' obligation under the contract to complete the two vessels. In August 1965 plaintiff sold the yard to Jacksonville Shipyards and subcontracted the completion of the vessels to the latter, but remained responsible to Maritime for completion. The *Oceanographer* was delivered in April 1966 and the *Discoverer* in December 1966, instead of the original contract delivery dates of May and August 1964.

The final contract price, including extra items totaling $246,962 authorized by Maritime during construction (over and above the automation and computerization), was $14,637,890. The final shipyard cost at completion was $21,823,056.51, or $7,185,166.41 in excess of the adjusted contract price. Plaintiff's gross loss on the portion of the contract completed after taking over from Gibbs was $7,908,619.40, its present claim. The theory of this case is that Aerojet is entitled to recover

that sum from the Government because plaintiff was induced, it says, to assume the contract because of and in reliance on Maritime's affirmative misrepresentation as to the status of contract completion and performance at that time, as well as Maritime's failure to disclose significant information bearing on how Gibbs would make out on the contract, and should therefore recover full compensatory damages for its directly resulting loss.

Prior to purchasing Gibbs, plaintiff dispatched teams of its representatives there for several weeks to inspect the facilities and work in progress, examine Gibbs' records, and confer with its management personnel. It also hired two firms of marine architects to survey the yard and its work in process. In particular, plaintiff investigated the completion status of the contract and its agreement to purchase was conditioned on assurance that the work was not in a loss condition. Plaintiff also conferred with Maritime. Both Gibbs and Maritime told plaintiff that the contract for the vessels was about half-complete as of April 30, 1964, and Maritime advised that the yard would probably break even upon completion. Plaintiff now contends that the contract was only 29.74 percent completed as of April 30, 1964, instead of the 51.93 percent figure given in a report signed by Gibbs and Maritime, and that a loss was highly probable. The plaintiff's lower figure represents the ratio between the actual costs to April 30, 1964, and the completed costs, a ratio whose validity would necessarily rest on the assumption (challenged by defendant) that excessive costs after that date were wholly attributable to the Government and that none was the contractor's fault.

Within a matter of months plaintiff discovered its costly mistake in acquiring Gibbs. Aerojet's Director of Contracts surveyed all aspects of the acqui-

---

1. "Plaintiff" will refer to both of the named plaintiffs, one being the parent corporation and the other a wholly owned subsidiary which was created expressly to purchase and operate the Gibbs shipyard.

sition intensively from September 8, 1964 to February 1, 1965, and estimated in January 1965 that plaintiff would lose $2,276,046 upon completion, subject to contingent reduction depending on the outcome of prospective claims against Maritime and Westinghouse, later abandoned. The Evaluation Report prepared by the Director of Contracts for plaintiff's private information painted a dismal portrait of the facilities, performance, and personnel of the yard. The report corroborates many findings based on facts elsewhere in the record as to the basic unreadiness of the yard to undertake such an ambitious project.

At the time it awarded the contract to Gibbs, Maritime had expected that Gibbs would probably lose money, although not nearly in the quantity ultimately suffered by plaintiff upon actual completion. These premonitions of loss were based on Maritime's awareness of Gibbs' deficiencies in facilities, personnel and experience, and from its knowledge that Gibbs' bid was far lower than Maritime's prebid cost estimates (due in large part to an underestimate of man-hours), or than the Congressional appropriations requested by Maritime and the Coast & Geodetic Survey for the two vessels, or than the average of eleven competing bids received, including one from National Steel & Shipbuilding Company whose recent experience in completing a somewhat comparable ship —the *Surveyor*—at a substantial loss had given it unique insight as to the prospective costs for the two ships in suit. Maritime had notified Christy (whose low bid was rejected for being technically nonresponsive) that its bid had obviously underestimated engineering hours and material costs. Actuated by like misgivings as to Gibbs' bid, Maritime demanded and received from Gibbs' parent corporation the latter's guarantee of a $600,000 subsidy to Gibbs if needed.

I.

Since plaintiff is suing the Federal Government for misrepresentation and failure to disclose, we are faced at once with the problem of whether Maritime's statements to, and other conduct toward, plaintiff at the time the latter was considering the take-over of the Gibbs' yard and contract were actionable (within the jurisdiction of this court)—regardless of whether defendant's activity, if otherwise actionable, caused the loss for which plaintiff asks relief.

The governmental actions plaintiff cites to us cover both affirmative statements and items of non-disclosure. The first category includes: (1) a progress payment report, certified by government inspectors (as well as by Gibbs), that the contract was almost 52% complete; this report was found by plaintiff's representatives in Gibbs' files when they were advising plaintiff on the possible take-over; (2) an oral statement by the contracting officer to plaintiff's agent that Maritime would not object to Aerojet's acquisition of Gibbs and that "while it did not appear that Gibbs would make a profit [on the contract], that it also did not appear that there would be a loss"; and (3) a written memorandum given by the Under Secretary for Transportation of the Commerce Department to a high official of plaintiff, which stated (in part): "Maritime advises that approximately one-half of the total construction [under the contract] is completed and, likewise, approximately one-half of the construction funds have been expended. On this basis, it now appears that the yard [Gibbs] will probably break even, financially, as far as these two vessels are concerned. * * * "; the memorandum also concluded that, in Maritime's view, construction of the vessels "should continue in a satisfactory manner."

The items the Government did not disclose, but should have (according to plaintiff), included (as plaintiff puts them): (a) the contract price for the two vessels, as awarded to Gibbs, was some $3,000,000 less than Maritime's own internal "reasonable" cost estimate, and, also, the agency's estimates for labor and engineering considerably exceed-

ed those of Gibbs; (b) the agency's survey group had forecast, before the award, that Gibbs would probably suffer a substantial loss on the contract; (c) Maritime had told another bidder (Christy) seeking the original contract that the latter's engineering estimate was too low, although it was substantially higher than Gibbs'; (d) the comparable *Surveyor,* previously built for Maritime by National Steel & Shipbuilding Company, required more actual man-hours to build than Gibbs had estimated for both of its vessels, and National Steel had lost some $2,700,000 on its contract; (e) Gibbs had told Maritime, before the take-over, that it would lose money on the contract; and (f) Maritime suspected, just before the take-over, that over a million dollars in excessive progress payments had probably been made to Gibbs.

## II.

■ Four preliminary points should be quickly made with respect to this charge of positive misrepresentation combined with culpable failure to disclose. The first is that the Government did not act fraudulently or in bad faith toward plaintiff; the trial commissioner found no such active misconduct,[2] plaintiff does not seek such a finding, and we see no basis for one; the maximum charge which can be levied against the defendant is one of negligence.

Second, this case was presented to the trial commissioner and to the judges, and must be determined, on the basis of plaintiff's claim of defendant's culpability toward it at the time of the take-over; plaintiff is not seeking to vindicate any separate claim by Gibbs that defendant acted improperly toward Gibbs in initially awarding the contract

to it,[3] and the evidence and findings bearing on that award are pertinent here only so far as they have a connection with Aerojet's own independent demand.

Third, though there is a question whether plaintiff has not overstated the error in the information supplied it by the Government, there is no doubt that that information turned out to be substantially inaccurate. Defendant does not deny this premise, and we accept it as a datum for the case. Under the position we take, the precise extent of the error need not be determined.

Fourth, the Government urges that we hold the entire claim tort-based and accordingly outside our jurisdiction. We do not reject that position, but neither do we accept it. Rather, we assume with plaintiff, for the purposes of the case and without deciding the issue, that the claim is contractually grounded in the novation by which plaintiff was substituted for Gibbs and undertook to finish the ship-construction agreement— and proceed on that postulate.

## III.

Did the Government breach any contractual obligation to Aerojet when it affirmatively gave misinformation, in good faith, to the latter? Assimilating its status to that of a successful bidder, solicited by the Government, who relies to his detriment on representations in the contract documents, plaintiff invokes the scores of cases stemming from Hollerbach v. United States, 233 U.S. 165, 172, 34 S.Ct. 553, 58 L.Ed. 898 (1914). Those lines of decision hold the Government liable either as an absolute warrantor of its specifications and representations or, sometimes, for lack of appro-

2. Commissioner Bernhardt said in this opinion: "We know of no reason to suspect a deliberate misrepresentation, and to say that Gibbs and Maritime dissembled because the one feared eventual loss and the other welcomed a more financially secure contractor would be sheer speculation. Simple mistake is more in keeping with the facts."

3. Gibbs appears to have released any such claim in the novation agreement. The trial commissioner considered a claim of that type to be "dubious", in any event, under the circumstances presented in the findings.

priate due care toward the other contracting party.[4]

Aerojet did not have, however, the same stance as those contractors. It was not solicited by the Government nor did the Government instigate the negotiations with it. Contrast Snyder-Lynch Motors, Inc. v. United States, 292 F.2d 907, 154 Ct.Cl. 476, 510 (fdg. 16) (1961). Maritime may have been happy at the substitution of Aerojet for Gibbs,[5] but it is a critical fact that the Government did not seek out plaintiff or let it be known in advance that it wanted a substitution for Gibbs.

Moreover, the mistaken information did not concern the scope of the contract work or the specifications or any obligation of the defendant under the contract with Gibbs. Plaintiff came to the Government for advice because, for its own reasons, it was considering acquisition of the Gibbs yard and a take-over of the Gibbs contract. The information plaintiff wanted did not involve any contractual obligation or activity of defendant (e. g., whether the Government would continue to make progress payments on the same basis as before) but solely the financial status of Gibbs vis à vis the contract, and the extent to which Gibbs had already performed *its* obligations. This was data the defendant may have had, and would likely want, for its own purposes, but not information which concerned the specifications or conditions for the construction of the two ships under contract, or the Government's responsibility toward the yard which was then building the vessels.

In this situation, we think that defendant did not warrant or guarantee the information sought by and supplied to Aerojet; at the most, the Government would have to exercise reasonable due care, in the circumstances, toward plaintiff. To impose the higher requirement is to equate plaintiff with successful bidders who can in normal course rightfully and reasonably expect that the Government's authorized and positive representations as to work, conditions, or specifications should be accepted at face value and without further inquiry. *Cf.* Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 699 (1964). Ordinarily both the procuring agency and the contractor (or about-to-be contractor) are intimately interested in the accuracy of warranted information which directly concerns the performance of the work. That is not true here. The requested information bore solely on the financial providence of Aerojet's assumption of Gibbs' place. Plaintiff could not reasonably expect the Government to guarantee the accuracy of this information as to Gibbs' status, passed on to Aerojet by courtesy of the defendant at the plaintiff's behest and in its dominant interest.

We assume, therefore, that defendant's conduct in supplying mistaken data and opinions should be measured, at most, by the less rigorous standard of due care.[6] But we find that plaintiff has failed to prove negligence toward plaintiff with respect to these affirmative statements made to Aerojet by the Government.

The first item relied upon in this category—the latest in the series of progress payment reports, which said that the contract was almost 52% complete—was not given by defendant to

---

4. See, *e. g.*, Flippin Materials Co. v. United States, 312 F.2d 408, 413, 160 Ct.Cl. 357, 365 (1963), and cases cited; Ragonese v. United States, 120 F.Supp. 768, 128 Ct. Cl. 156 (1954); Snyder-Lynch Motors, Inc. v. United States, 292 F.2d 907, 154 Ct.Cl. 476 (1961); Morrison-Knudsen Co. v. United States, 345 F.2d 535, 170 Ct.Cl. 712 (1965); Womack v. United States, 389 F.2d 793, 182 Ct.Cl. 399 (1968).

5. The trial commissioner's opinion refers to Maritime's "pleased" approval and its "alacrity" in approving the transfer.

6. We leave open the possibility that, for a contract claim in circumstances like these, the general standard may be the still lower one of recklessness or gross negligence or, perhaps, even of absence of any obligation at all.

plaintiff, but was found by plaintiff's representatives in the Gibbs files. The report was a routine one, not prepared for plaintiff's use or with plaintiff in mind, but solely for the Government and for Gibbs. Although we are positing that this is not a tort claim (see Part II, Fourth, *supra*), there is obviously a close relationship with the standards of conduct established for comparable tort actions. In that area of the law, defendant would not be liable to Aerojet because the information was not prepared for the latter's benefit, with intent to influence it, or with knowledge or expectation that Gibbs would hand it over to Aerojet. See A.L.I., Restatement of the Law Second, Torts, Tent. Draft No. 12 (1966), § 552, and also the Reporter's note, and comments *h* and *i*.[7] It is entirely appropriate to use the same rule of non-liability for a presumed contract claim which entails the same factors and considerations on which the tort standard is based.

■ In addition to this absence of obligation toward plaintiff there is inadequate proof that defendant failed to exercise reasonable care or competence in certifying the report. The parties have stipulated that these progress reports represented the best evidence available as to the percentage of completion of the contract at any given time, and though this particular report was probably in error we cannot see that plaintiff has succeeded in demonstrating that it was

carelessly drawn up. Maritime followed its established procedure with respect to this report, and no short-cuts were taken. In the making of the reports, the calculations were somewhat complex and the result was always subject to some margin of error (note 8, *infra*). (See, also, the discussion *infra* as to the direct representation to Aerojet that the work was half-done.)

■ The other affirmative statements which plaintiff invokes are an oral remark to plaintiff that "while it did not appear that Gibbs would make a profit [on the contract], that it also did not appear there would be a loss", and a written memorandum for plaintiff's benefit, saying that "approximately one-half of the total construction is completed", "it now appears that [Gibbs] will probably break even, financially, as far as these two vessels are concerned", and that construction of the ships should continue satisfactorily. These were not, on the whole, very positive, definite, or detailed observations; their use of "appear" or "appears", "approximately", and "probably" indicates their somewhat equivocal character. They were more in the nature of general opinions, proffered as such, than flat representations of fact.

With respect to the statement that one-half of the contract was completed, plaintiff has not proved that this observation, any more than the progress payment report discussed above, was negli-

7. Section 552 is as follows:

"§ 552. *Information Negligently Supplied for the Guidance of Others.*

"(1) One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in subsection (3), the liability stated in subsection (1) is limited to loss suffered

(a) By the person or one of the persons for whose benefit and guidance he intends to supply the information, or knows that the recipient intends to supply it; and

(b) Through reliance upon it in a transaction which he intends the information to influence, or knows that the recipient so intends, or in a substantially similar transaction.

"(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

gently made. The Government used this figure for its own purposes and believed it to be correct; it was not a figure "cooked up" to influence plaintiff. It is now known to have been wrong, but the trial commissioner thought 42%, "in retrospect", probably "a more realistic level of completion than any other figure supplied by the record"—and 42% is not so far away from 50%.[8] We are not prepared to say that Maritime and Commerce failed to exercise reasonable care or competence in giving this judgment to plaintiff.

The suggestion that "it did not appear" that Gibbs would suffer a loss, that "it now appears" that Gibbs "will probably break even", and that further construction should prove "satisfactory" also provide a tenuous hold for a finding of negligence. These were, by their very nature, expressions of opinion— genuinely held, the trier-of-fact has found—and clearly opinions rather than representations of hard or definite fact. Even these expressions of opinion were in the form of estimates, approximations, and judgments. *Cf.* Tree Preservation Co. v. United States, 172 Ct.Cl. 577, 581 (1965). They were not firm statements, but were subject to the play and latitude common to broad opinions of this type. Plaintiff's strenuous effort to show that it was not negligent in taking over the Gibbs contract (see Part V, *infra*) seems to us to demonstrate, if accepted, that the defendant was equally free of blame in what it told Aerojet; the relevant factors were so intangible and fluctuating that mistaken optimism could take the lead without being accused of turning into outright negligence.

Specifically, Aerojet sees proof of lack of due care in the Government's expectation, at the time of the award to Gibbs, that the latter would probably lose money on the job, as well as in later intimations of trouble which cropped up during Gibbs' performance. As we have indicated, these do not, in our view, require the brand of carelessness to be placed on the later evaluations. Though the initial thinking was that Gibbs would probably suffer a loss, plaintiff has not demonstrated to our satisfaction that the subsequent reappraisal, though in the end it was wrong, was carelessly made at the time. These are matters of wide judgment, and negligence is not mechanically proved by showing that the appraiser held different opinions at different moments.[9]

## IV.

■ The other aspect of plaintiff's claim is that defendant failed to disclose some significant information (see Part I, *supra*), known to the Government but not to Aerojet, which had a direct bearing on plaintiff's consideration of whether to take over Gibbs and the two-ship contract. Again, plaintiff puts itself in the same posture as a successful bidder misled by the Government's failure to reveal information vital to that contractor's performance of the work but which he does not know and cannot obtain elsewhere (or does not realize that he needs to know).[10] On

8. The commissioner pointed out that "an estimate of the percentage of completion of a vessel under construction is accurate only within plus or minus five points" and "the lower limit of Maritime's 51.93 percent completion figure of which plaintiff complains would be 46.93 percent, a scant five percent above the 42 percent figure * * *."

9. The trial commissioner has found and we agree (fdg. 29) that "it is reasonable to conclude that by May 1964, if not before, Maritime had cause to suspect that the contractor [Gibbs] would incur a substantial loss on the contract because of its disproportionate bid coupled with the delays being experienced in the delivery of automation equipment from Westinghouse, as well as other delay-producing difficulties which Gibbs had experienced." But this is not the same as saying that defendant was negligent in giving a contrary opinion to plaintiff. Having "cause to suspect" is not the equivalent of "should necessarily have come to the conclusion."

10. Plaintiff cites Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160

this phase of the case, too, we see Aerojet in the quite different light of a would-be voluntary intervenor coming to the United States for information, not as to the scope or conditions of the work or the specifications, but as to the chances of the work's being done within the sum which had already been bid. In a fixed-price agreement, the latter is not normally a matter as to which the Government has any direct responsibility.

■ Another important differentiating factor is that Aerojet was already keenly alert to the problem of Gibbs' then status and was not disabled from obtaining, on its own, more complete information on that subject (if it wished to spend the time and effort) from Gibbs and its records. *Cf.* H. N. Bailey & Associates v. United States, 449 F.2d 376, 382–383, 196 Ct.Cl. 166; Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 547, 184 Ct.Cl. 18, 37 (1968); Donald M. Drake Co. v. United States, 439 F.2d 169, 172, 194 Ct.Cl. 549, 555 (1971); Jefferson Constr. Co. v. United States, 364 F.2d 420, 424, 176 Ct.Cl. 1363, 1370, cert. denied 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967). Perhaps plaintiff could not get all of the precise items which it now cites (see Part I, *supra*), but it already knew a great deal and was free to instruct itself much more than it did on Gibbs' capacities and performance (see Part V, *infra*).[11] The few pieces of information which defendant failed to disclose, and at the same time which plaintiff could not discover for itself, formed but a minor part of the total picture.

■ If this were indisputably a tort case alone—if, for instance, plaintiff had acquired Gibbs but not taken over the contract, or if plaintiff were a banker considering whether to lend money to Gibbs (and in either instance had had the same sort of dealings with the Government)—there could be no recovery for the nondisclosure in the circumstances shown by the record. See A.L.I., Restatement of the Law Second, Tort, Tent. Draft No. 12 (1966), § 551.[12]

Ct.Cl. 437 (1963); J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968); Aerodex, Inc. v. United States, 417 F.2d 1361, 189 Ct.Cl. 344 (1969); Snyder-Lynch Motors, Inc. v. United States, 292 F.2d 907, 154 Ct.Cl. 476 (1961); Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 145 Ct. Cl. 387 (1959); Ragonese v. United States, 120 F.Supp. 768, 128 Ct.Cl. 156 (1954); and Potashnick v. United States, 105 F.Supp. 837, 123 Ct.Cl. 197 (1952).

11. The trial commissioner properly said in his opinion that "in 1964 when plaintiff acquired Gibbs it was well aware of the 1962 bid results" "and of the appropriation disparities" "or at least had access to such knowledge and is charged with it."

12. Section 551 reads:
"*Liability for Nondisclosure.*
"(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the non-existence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
"(2) One party to a business transaction is under a duty to disclose to the other before the transaction is consummated
(a) Such matters known to him as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
(b) Such additional matters known to him as he knows to be necessary to prevent his partial statement of the facts from being misleading; and
(c) Subsequently acquired information which he knows will make untrue or misleading a previous representation which when made was true or believed to be so; and
(d) The falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
(e) Facts basic to the transaction, if he knows that the other is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade,

Wholly apart from the signal fact that the Government did not actually "know" that these matters were important to Aerojet or that the latter would be misled,[13] none of the pre-conditions for the existence of a duty to disclose (in tort law) exists here. There was no such relationship as called upon defendant to volunteer the particular items plaintiff mentions, and in turn these items were all peripheral, though relevant, to the matters about which plaintiff expressed concern.

In the light of this tort rule and the quite different elements supporting our contract decisions finding liability for a failure to disclose by the Government, we determine that defendant is not liable for breach of contract for its failure to reveal to plaintiff the various items which Aerojet now insists should have been disclosed. The situation at that time did not require Maritime to volunteer the information.

### V.

■ We have held (in Parts III and IV, *supra*) that, either because there was no obligation to plaintiff or because negligence has not been shown, defendant is not liable for the affirmative misinformation given to plaintiff or for the failure to disclose certain facts. If nevertheless it be thought that there were such legal obligations which were breached by negligence on the part of the Government, then we would have to hold that Aerojet was so contributorily negligent as to bar it from recovery. If the defendant was careless, then the following circumstances should likewise have alerted plaintiff to the probability of error in the optimistic statements made to it by the Government:

1. During its preacquisition investigation of Gibbs, plaintiff engaged the services of two marine engineer firms. One of them, M. Rosenblatt & Son, Inc., examined the two vessels and all records pertaining to the contract and advised plaintiff that the contract was 47 percent complete as of May 15, 1964. By extrapolation based on the estimate of the official progress report for that date that the contract was 56.76 percent complete, the plaintiff could have computed that the completion percentage as of April 30, 1964, was 42 percent, not 51.93 percent (as shown on the progress report for that date).

2. Prior to acquiring Gibbs, plaintiff had full access to its records and thus is charged with knowledge of the sharp disparity between Gibbs' original bid and the spread of bids by other bidders. The average of all eleven bids was $15,240,654, or $2,649,726 more than Gibbs' bid of $12,590,726. The bid of National Steel and Shipbuilding Company, which had in 1960 suffered a substantial loss in constructing the *Surveyor*, a somewhat comparable ship, and was thus a more knowledgeable estimate because of that experience, was $15,211,000, or $2,620,072 more than Gibbs' bid. Plaintiff could also have discovered the gaps between Gibbs' bid and the appropriations for the vessels.

3. Plaintiff knew that Gibbs had been through a bankruptcy proceeding in 1962, that it was in financial difficulties in 1964, and that before awarding the contract to Gibbs, Maritime had required that America Corporation, Gibbs' parent company, pledge $600,000 toward the contract. This was to compensate for what Maritime considered to be a substantial underestimate of manhours in Gibbs' bid; Maritime felt that Gibbs would probably incur a loss of about $300,000 on the one ship, the *Oceanographer*, because of this underestimate of manhours, and it would be reasonable to

or other objective circumstances, would reasonably expect a disclosure of such facts."

13. Comment *l* to § 551 states that there is no duty to disclose where "the plaintiff has equal opportunity for obtaining in-

formation, which he may be expected to utilize if he cares to do so, or where the defendant has no reason to think that the plaintiff is acting under a misapprehension." See also, Restatement of the Law, Contracts (1932) § 472(1)(b), and comment *b*.

approximately double that dollar estimate for two ships. There is no positive evidence that plaintiff actually knew of these latter facts, but they were available to be known through investigation of Gibbs' records and inquiry from Gibbs' personnel. The $600,000 pledge was certainly known to Aerojet.

4. Gibbs' records, which were available for examination by plaintiff in the course of its preacquisition investigation of Gibbs, reflected delays in Gibbs' performance of the contract by a railroad strike which delayed steel deliveries, abnormal weather, and substantial delays by Westinghouse in its deliveries under several subcontracts, including the critical automation subcontract. On January 26, 1964, Gibbs had requested a price increase from Maritime because of delays due to the failure of Westinghouse to furnish subcontract drawings or deliver subcontracted equipment for the automation and computer systems. Plaintiff's awareness of the Westinghouse delay situation is shown by its letter to Westinghouse of May 29, 1964, a day after the formal transfer of the Gibbs facilities to plaintiff, expressing its dissatisfaction with the Westinghouse performance which it said had resulted in serious costs and disruption of the construction schedule. Later a suit against Westinghouse was considered, but not pursued.

5. The monthly force reports submitted to Maritime by Gibbs, which were available for examination by plaintiff prior to its acquisition of Gibbs, contained data from which it could be calculated that, as of April 30, 1964, 87.5 percent of the manhours which Gibbs had originally scheduled for the *Oceanographer* (420,000), and 40.7 percent of manhours scheduled for the *Discoverer* (307,225), had been expended. These originally scheduled manhours did not, however, include the manhours required for the automation and computer additions to the contract, so the percentage figures of manhour consumption as of April 30, 1964, are subject to reduction in an unknown amount. The automation and computer additions were conditioned on contract extensions being given as justified.

6. Plaintiff could have discovered that Gibbs' booked costs as of May 15, 1964, were $933,048 less than its contract receipts, a profit which, considering the sharp disparity of Gibbs' bid and the costs of the various delays which had affected performance, would be difficult to reconcile with a contract reputed to be 51.93 percent complete as of April 30, 1964, and 56.76 percent complete as of May 15, 1964.

This was all helpful information which Aerojet could have obtained and evaluated, but did not. If the Government was negligent in what it told plaintiff or did not say, then plaintiff also failed to exercise due care in not following up these leads. As we have already suggested, we are not able to escape the conclusion that, if the Government is thought to have been careless, so was plaintiff, and in significant degree. We cannot hold the defendant culpable and simultaneously absolve Aerojet.

On the assumption that Maritime and Commerce were careless, it makes no real difference whether we say that plaintiff is barred from recovery by its contributory fault or that it cannot prevail because the Government's misrepresentations did not effectively cause the loss which could and should have been prevented by greater care on the part of plaintiff. In either formulation, the important notion is that Aerojet's responsibility was at least commensurate with that of the Government; it could and should have helped itself. *Cf.* Ragonese v. United States, 120 F.Supp. 768, 770–771, 128 Ct.Cl. 156, 162 (1954); Anthony M. Meyerstein, Inc. v. United States, 137 F.Supp. 427, 431, 133 Ct.Cl. 694, 700 (1956); Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 460 (1960); Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 779, 160 Ct.Cl. 437, 445 (1963); J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 890 n. 10, 182 Ct.Cl. 615, 623 n. 10 (1968).

## VI.

These are the reasons why we hold defendant not liable to plaintiff. The trial commissioner touched on these grounds but placed his decision mainly on his conclusion that plaintiff's losses were "attributable neither to Maritime nor its alleged misrepresentation of interim completed status, but rather were [independently] chargeable either to plaintiff, its predecessor contractor Gibbs, subcontractor Westinghouse, or to other events not attributable to the Government by any legal legerdemain." In view of our holding on liability, we need not consider this separate position that, in any event, the Government did not cause the losses which had wholly other roots.

For the reasons we have given, plaintiff is not entitled to recover and its petition is dismissed.

NICHOLS, Judge (dissenting):

This case is troublesome to me, and I have changed my views about it more than once. There follow my 2¢ worth, now tested as much as I know how.

The court asked the right question, I think, which is what duties did defendant owe plaintiff during the discussions that led to the making of the novation? But it assumes rather than demonstrates the answer and comes to the wrong one. Plaintiff claims the benefit of decisions respecting mistaken Government statements of essential conditions (Hollerbach v. United States, 223 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); Chris Berg, Inc. v. United States, 404 F.2d 364, 186 Ct.Cl. 389 (1968); Womack v. United States, 389 F.2d 793, 182 Ct. Cl. 399 (1968)), or withholding of superior Government information on matters essential to successful performance (Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 198 Ct.Cl. —— (1972); J. A. Jones Const. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968); Snyder-Lynch Motors, Inc. v. United States, 292 F.2d 907, 154 Ct.Cl. 476 (1961)). Compare, also, two recent cases in which the court has held the defendant responsible for the correctness of oral statements by its officials at bidders' conferences. Sylvania Elec. Products Co. v. United States, 458 F.2d 994, 198 Ct.Cl. 106 (1972); Manloading & Management Associates v. United States, 461 F.2d 1299, 198 Ct.Cl. ——, (1972). The court says, no, these successful complaints were by contractors misled or denied information between invitation to bid and award; plaintiff here came into contract privity later on, by novation, long after award, and therefore none of these cases apply. Whatever duties the Government owes remain unstated, but whatever they are, they are held not necessarily breached by Government errors which would be breaches, if committed before the initial award with respect to the original contractor.

It is true the Government, by invitation to bid or request for proposals, with representations and specifications, is normally inviting adhesion to a contract of its drafting, and thereby it assumes various implied obligations to those who adhere. When the contractor comes in with superior knowledge, and the specifications are essentially its own, for the Government to adhere to, the case will be fundamentally different. See, e. g., Bethlehem Corp. v. United States, 462 F.2d 1400, 199 Ct.Cl. —— (1972). Here, however, it seems to me *Aerojet-General* was in effect adhering to a deal it never made, and as to which it had inferior knowledge. True, defendant was passive and did not solicit *Aerojet-General's* adhesion. This is the distinction in the court's mind. The novation, the court must think, was solicited for *Aerojet-General's* and Gibbs' convenience, not defendant's, and therefore it generates fewer rights.

I answer that the defendant was in no way obliged to make a novation unless it saw advantage to itself. If it had held *Aerojet-General* at arm's-length and insisted on dealing with Gibbs alone, it would have been within its rights, so far as we are told. In that event, its present attitude towards its own misrep-

resentations might be justified and *Aerojet-General* might well have no valid complaint, whatever capital it might have ventured and lost in building the ships, by way of loan to Gibbs, perhaps, or purchase of an equity interest. It seems to me, however, when *Aerojet-General* is admitted to privity of contract, it is not a second-class citizen, anymore, but there inure to it the benefits and privileges that inure to other Government contractors.

The situation of a contractor failing in performance of a major Government contract is a messy one fraught with possibilities of financial loss to the Government, as well as its inability to get what it contracted for, free of defects and on time. To bring in a stronger entity to complete the job, before actual failure or default, is a common remedy, advantageous to all concerned. To treat the newcomer as a kind of inferior interloper is not the way to cement the foundations of a shaky procurement, no matter whose idea initially the novation was. Whether defendant solicited the deal, or the failing contractor, or the newcomer, should be irrelevant once the novation is signed by all three. Yet I gather that the court here would reach a different result if it appeared that Maritime had solicited *Aerojet-General* to become a party to this contract.

In Government contract litigation, for obvious reasons based on the structure of Government agencies, we rarely distinguish between what a Government official knew and what he ought to have known. Examples are the *Chris Berg, Womack* and *J. A. Jones Construction Co.*, cases already cited, wherein knowledge that should have been available to the official preparing invitations to bid, or specifications, because he should have asked or somebody should have told him, is imputed to him whether he actually had it or not. In *Womack*, we said, 389 F.2d at 801, 182 Ct.Cl. at 412–413:

> * * * In short, in promulgating an estimate for bidding-invitation purposes, the Government is not required to be clairvoyant but it is

obliged to base that estimate on all relevant information that is reasonably available to it.

Our commissioner finds as a fact— and the court agrees—that by May 1964, *i. e.*, before the memo of May 15, 1964, assuring plaintiff that the construction was half completed and approximately half the construction funds expended, Maritime had cause to suspect the contractor would incur a substantial loss on the contract because of its disproportionate bid coupled with the delays being experienced in the delivery of automation equipment from Westinghouse, as well as other delay-producing difficulties. Finding 29. I think he should have found, and we should find, that Maritime knew or ought to have known, that construction was not half completed, not by a wide margin. This information was there for the asking. The percentage of completion, as officially reported, and concurred in by the Maritime inspectors, was 51.93% on April 30 and 56.7% on May 15, both 1964. By some strange coincidence, the facts as to the error of these figures began to come to the attention of Maritime just upon or just after plaintiff's takeover of the contract. It was noticed that Gibbs had acquired nothing like the quantity of components and material the figures reflected. Engineering was not 95% complete, as reported on April 30. Only 40% of eventual engineering hours had been expended. Finding 28. Maritime's auditor is quoted as saying such errors could have been detected much earlier if he had made more frequent inspection visits. Detected by him, or by anyone else with a normal supply of skepticism or mistrust, I would add. Aware as he was of the disproportionate bid and its potential for causing disaster all round, and of the apparent conflict between Maritime's forecast of the contract experience and what the percentage of completion figures seemed to show, it would seem he should have conducted such inspections, or else should have imputed to him what he would have learned from them, as things he should have known.

While the "point system" is represented as giving only the most inaccurate indications of the percentage of completion, Maritime relied on it to make progress payments, holding back only 5%. This would have been improper if the system was really known to be nearly useless. It appears to me to be inescapable that the system would have worked much better than it did if anyone had tried before the takeover to make it accurate, as they did with belated zeal after the takeover. If the system had worked as it should have, Maritime would have had actual "superior knowledge" with respect to the percentage of completion. As things were, I think it had imputed "superior knowledge."

Plaintiff went to the Under Secretary to learn the status of the contract before the novation. The purpose of its inquiries was known and Maritime's consent to the novation was only six days in the future. If Maritime's officials really believed that the percentage of completion figures they had were "essentially arbitrary", "an educated guess" they needed only to say so. Instead, they advised the Under Secretary, for him to advise the plaintiffs, in writing, that approximately one-half the total construction was completed and half the construction funds were expended. The Under Secretary gave this memo to plaintiffs. This was an implied representation that Maritime knew what the percentage of completion was.

Plaintiff also tried to find out through its experts, M. Rosenblatt & Son, what the percentage of completion was. They came up with 47% as of May 15, almost 10% under the official figure, for that date, though they placed "considerable reliance" [1] on the April 30

1. 21. (a) In the course of investigating its prospective purchase of Gibbs, the plaintiff engaged two prominent firms of naval architects and marine engineers, Gibbs & Cox (not to be confused with Gibbs Shipyard, Inc.), and M. Rosenblatt & Son, Inc. Gibbs & Cox made a one-day inspection of Gibbs on April 29, 1964, to report on the condition and capabilities of available facilities. The report concluded that "the work being accomplished at the yard in connection with new construction * * * appeared to be acceptable. It would appear that, provided additional equipment, machinery, etc., is installed, the capability of the shipyard with respect to new construction might be assured." No appraisal was made by Gibbs & Cox of the progress of any specific construction contracts then pending in the yard.

(b) From May 15 through 17, 1964, four technically qualified representatives of Rosenblatt visited Gibbs to estimate the percentage completion of the OSSes. They examined the incomplete vessels, consulted with Gibbs' officials, and examined a variety of documentary material and records, including construction progress reports, progress billings, contract documents, Gibbs' bid breakdown of labor, material and overhead, cost analyses, equipment procurement records, inventory, etc. While Rosenblatt did not accept responsibility for the accuracy of its report because it had not made a formal audit and had very limited time, it deemed its conclusions to be reliable, namely, that as of

May 15, 1964, the contract was 47 percent complete (57 percent for the *Oceanographer* and 36 percent for the *Discoverer*), and that the cost projected to completion would be $14,000,000, with $1,000,000 profit. Rosenblatt's 47 percent completion estimate was based on a projection of all costs through completion, "including all Changes presently contemplated and others as yet unanticipated," and assumed that "the work will be progressed with the same degree of efficiency in the future as it has been in the past." [5]

5. Considering that Rosenblatt knew that Gibbs' total costs reported to Maritime through May 15, 1964, were $7,519,232, and that 47 percent of the $14,000,000 estimated total cost to completion would be $6,580,000, it would appear on the surface that as of the May 15, 1964, date Gibbs had already expended 54 percent of the total estimated cost to completion, or $939,232, more than the Rosenblatt 47 percent estimate. The extent to which the excess may have been represented by inventory is not ascertainable in the available record.

The Rosenblatt estimate of 47 percent completion placed considerable reliance on Construction Progress Report No. 31 (characterized by the witness from Rosenblatt to be the "best evidence" of physical progress) which reported that as of April 30, 1964, the contract was 51.93 percent complete. The Rosenblatt report made one or two adjustments to the construction progress report distribution of points

official figure. Undoubtedly this conclusion was optimistic, but should have been a forewarning of disaster. I infer from the findings that it would have been almost impossible to make a determination truly independent of the official figure. This is as clear-cut an instance of "superior knowledge" in the Government as you could wish to find, the only other source being the self-serving assertions of the vendor, the president of Gibbs. The plaintiff, it appears, unhappily chose to attach credence to what the Government told it, rather than depend on Rosenblatt for this item of information, and this was reasonable if the findings are right in indicating that Rosenblatt's knowledge was necessarily "inferior," despite their best efforts.

Since defendant chose to give out the information, had the means to have had it accurate, and was under a duty to have it so, the duty of plaintiff to ascertain the full horror of the situation for itself was modified accordingly. *Womack, supra.* If plaintiff had a right to rely on the official figures I question whether the other warning flags, which clearly did exist, were sufficient to establish that plaintiff could have avoided

its loss by due care. In this respect, the parallel of our recent *Hardeman-Monier-Hutcherson* decision, *supra*, is instructive. The contract there called for building a pier on a remote sound in northwestern Australia. Defendant had information developed through recent surveys by Australian government vessels, which tended to show that wind, wave, current and bottom conditions would make the work more dangerous, difficult, slower and costlier than could be ascertained from previous weather and hydrographic information accessible to bidders. Plaintiff, before bidding, asked for these surveys and was refused them. We held this refusal was a breach of contract making defendant liable, for how much remains to be ascertained at this writing. Defendant with its cross motion submitted documents tending to show that another bidder made observations at the site which put it in possession of substantially the information obtained in the surveys. We refused to speculate whether plaintiff, too, might have informed itself in that manner.

If the defendant has a duty to supply meaningful information which it has, and refuses, you are not obliged to show

between material and labor, but agreed pretty well with the points allocated to labor. Gibbs' president, Mr. Fletcher, informed the Rosenblatt representatives that he considered the 51.93 percent completion figure as of April 30 in the progress report to be fairly accurate and, if anything, the ships were more than 51.93 percent complete as of the indicated date. Mr. Royce, who was at the time Gibbs' project manager and remained on as such for Aerojet, testified that he believed the contract to be between 30 and 40 percent complete instead of 51.93 percent, but that he was "out-voted." Apparently Royce's views were not known beyond the circle of Gibbs' officials. Since the Rosenblatt report estimated the contract to be 47 percent complete as of May 15, 1964, as compared to the 56.76 percent completion figure in the progress report of the same date, it would have been reasonable for plaintiff to have suspected that the 51.93 percent completion figure in the progress report for April 30, 1964, may have been overstated in a comparable amount, and by simple reconstruction to have computed

that Rosenblatt would necessarily have estimated the contract to have been 42 percent complete as of the earlier date. Rosenblatt's estimate of 47 percent completion as of May 15, 1964, is not easily reconcilable with its estimate that final costs upon completion would be less than the [adjusted] contract price, assuming a constant level of production efficiency. There is a reasonable margin of error of five percent in estimating percentage of completion under the point system. Thus as of April 30, 1964, the 51.93 percent completive estimate in the progress report of that date could be anywhere from 46.93 percent to 56.93 percent, according to plaintiff's principal witness. A highly experienced expert witness for defendant who had spent many years as president of a major American shipyard testified that you cannot determine the percentage of completion of a partially completed ship by "eye-balling" it or by study of the builder's cost record, but rather such a determination required a detailed breakdown and painstaking measurement of the ship's many components.

you could not possibly have obtained it elsewhere. It is enough if defendant's knowledge is superior or represented by it to be. If information is not refused, but is supplied incorrectly, the same rule should be *a fortiori*, since the contractor is thereby lulled into security, whereas *Hardeman-Monier-Hutcherson*, if more intuitive, would have been greatly perturbed by the refusal of the surveys. *Cf.* discussion in Flippin Materials Co. v. United States, 312 F.2d 408, 413, 160 Ct.Cl. 357, 365 (1963).

Here the key to everything else should have been the percentage of completion. With a correct figure, plaintiff would have been forewarned; without it, the most one can say is that a number of available facts, pieced together, might have told plaintiff the story. But it would have had to disbelieve the official figure, which it did not choose to do. Thus part V of the court's opinion really assumes the correctness of its previous holding as to defendant's duty in the premises, and is not a separate ground of decision.

Nothing here said should be construed to support plaintiff's claim for all its losses. My mind is open as to what a proper formula would be, if indeed the findings before us even permit one to be stated. It would probably be necessary to break down the claim into items and go through them one by one, as in the recent breach case of Mid-West Constr. Co., Ltd. v. United States, 461 F.2d 794, 198 Ct.Cl. —— (1972). Since a majority does not agree with me on entitlement, I deem it unnecessary to go into quantum, except for the above caveat. I believe a proper outcome would show plaintiff still bearing much of its loss.

DURFEE, Senior Judge, joins in the foregoing dissenting opinion.

**NORTHWESTERN INDUSTRIAL PIPING, INC.**

v.

**The UNITED STATES.**

No. 541–71.

United States Court of Claims.

Oct. 13, 1972.

