**GLASGOW ASSOCIATES**

v.

**The UNITED STATES.**

No. 178–65.

United States Court of Claims.

Feb. 20, 1974.

William Hart, New York City, for plaintiff; Robert R. Hume, New York City, attorney of record. Dale W. House, Hart & Hume, New York City, of counsel.

John W. Showalter, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant Judith Ann Yanello, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA, and KUNZIG, Judges.

OPINION

KUNZIG, Judge:

At issue in this suit for recovery of $200,000 is whether the Government, through various uncontroverted actions, breached a Capehart Housing contract between the Air Force and plaintiff. We hold for defendant, rejecting plaintiff's assertion that the Government's course of conduct constituted actionable breach.

The present action represents the sole surviving claim of a 14-count petition filed by plaintiff in this court for uncompensated costs arising under plaintiff's Capehart Act contract for the construction of 460 housing units at Glas-

gow Air Force Base, Montana (Glasgow).[1] By decision of June 13, 1967, the Armed Services Board of Contract Appeals declined consideration of this count on the ground that it lacked jurisdiction over it.[2] To expedite the court's *de novo* consideration of this final claim, the parties have stipulated "all the pertinent facts,"[3] which are summarized as follows:

Plaintiff is a joint venture organized for the purpose of contracting with defendant for the construction of Capehart Housing under section 803 of the National Housing Act.[4] On November 24, 1958, the Department of the Air Force issued Invitation for Bid (IFB) No. 13–606–59–32 for the construction of the Glasgow housing project. At that time, the statutory maximum interest guaranty rate for Capehart Housing mortgages was $4\frac{1}{2}$ per cent while the maximum rate permitted by the Commissioner of the Federal Housing Administration (FHA) by administrative rule pursuant to the National Housing Act was $4\frac{1}{4}$ per cent. In accordance with this administrative rule, IFB 13–606–59–32 contemplated that the contractor would obtain financing at an interest rate not exceeding $4\frac{1}{4}$ per cent.

The availability of private construction mortgage funds, which are required for Capehart Housing, was dependent on the FHA guaranty. Since the maximum interest rate which FHA would guarantee was lower than the prevailing rate, Capehart borrowers were required (even with the FHA guaranty) to pay an additional fee by way of a discount or "points" to obtain financing. The amount of these additional fees was fixed by lenders who received such "points" in addition to interest charged.

On January 24, 1959, plaintiff submitted its bid. Plaintiff computed the cost to it of obtaining financing as three "points," or approximately $220,000, and included this sum in its bid. At this time, plaintiff had not yet actually secured private financing.

On February 17, 1959, Thomas Hefferan, the Director of Real Property Management, Office of the Assistant Secretary of Defense for Properties and Installations, advised the Under Secretary of the Air Force, Assistant Secretary of the Army, and Assistant Secretary of the Navy as follows:

> After careful consideration of recent trends in the market for Capehart housing mortgages, this office has recommended to the Federal Housing Commissioner that the interest rate on Capehart mortgages be increased from $4\frac{1}{4}$ percent to $4\frac{1}{2}$ percent, the current statutory maximum rate.

> In view of the fact that the announcement of the increased rate will doubtless have an adverse effect on the $4\frac{1}{4}$ percent mortgages, it appears that every possible step must be taken to reduce to a minimum the number of projects affected by the change.

Beginning in mid-February, rumors circulated throughout the financial community that a change in the maximum permissible interest rate was probable.

The Hefferan memorandum was received by the office of the Assistant Secretary of the Air Force for Installations on or shortly before February 25. On February 25, it was forwarded

---

1. Ten of the 14 counts were disposed of upon remand to the Armed Services Board of Contract Appeals, and three others on cross-motions for summary judgment decided by this court by order, 198 Ct.Cl. 991 (1972).

2. Burl Johnson Associates & Glasgow Associates, 67–2 BCA ¶ 6398.

3. Hence, the Wunderlich Act (41 U.S.C. §§ 321, 322), which normally obtains in government contract cases, is not applicable here.

4. Amendment of August 11, 1955, ch. 783, Title IV, § 401, 69 Stat. 635. Because the operation of the Capehart Act is thoroughly reviewed at Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 457–458 (1963), explanation of this amendment to the National Housing Act is unnecessary here.

through a routine chain of operation to the Housing Division of the Assistant Secretary's office. One of the functions of this division was to review the three lowest bids for a construction contract and to recommend award to the lowest qualified bidder.

Under date of Friday, February 27, 1959, the Housing Division issued plaintiff a Letter of Acceptability advising that plaintiff's bid was the lowest acceptable for IFB 13–606–59–32 and directing completion of various requirements in preparation for initial closing of the contract. On this date, the individuals involved on behalf of defendant in the contracting process with plaintiff did not have actual knowledge of when, if at all, the Commissioner of FHA would officially increase to 4½ per cent the maximum permissible interest guaranty rate.

Announcement of such an increase was made by the Commissioner on the following Monday, March 2, effective following the close of business that day. The news release stated:

> This action was taken as a result of a recommendation from the Department of Defense and of analysis of the current mortgage market by the Federal Housing Administration indicating the necessity for such an increase in order to improve the flow of funds to [the Capehart] program.

At no time prior to the FHA announcement did defendant advise plaintiff of the contemplated interest guaranty rate increase.

Plaintiff received the Letter of Acceptability on March 6. By memorandum dated that same day, the Assistant Secretary of Defense for Properties and Installations advised the Under Secretary of the Air Force, the Assistant Secretary of the Army, and the Assistant Secretary of the Navy as follows:

> Effective March 3, 1959 the new interest rate will be applied to Capehart projects in accordance with the following criteria:

1. Projects which were advertised and bid at 4¼ percent will be closed at 4¼ percent, as follows:

a. Letter of Acceptability issued —no exception.

b. Letter of Acceptability not issued—if hardship is clearly demonstrated and is directly attributable to the lower interest rate, all bids should be rejected and the project re-advertised.

2. Projects currently under advertising (bids not opened) at 4¼ percent will be subject to the new rate and advertising will be amended accordingly.

3. Projects advertised subsequent to the effective date will be subject to the rate prescribed by the FHA rules and regulations at the time of advertising.

On April 30, 1959, the parties entered into a contract for the construction of the Glasgow Capehart project. Plaintiff at that time also delivered to defendant various documents required under the Letter of Acceptability, including evidence of the fact that plaintiff had arranged financing the project with mortgages bearing a 4¼ per cent interest rate. The actual cost to plaintiff of obtaining a financing commitment, which was accomplished subsequent to the March 2 guaranty rate announcement, was 5⅝ "points," or $419,678, approximately $200,000 more than plaintiff originally estimated and included in its bid. It is this last amount of additional cost which plaintiff here seeks to recover.

A decade ago, this court rejected a similar contractor's claim stemming from the same FHA interest guaranty rate increase on the ground that the FHA decision constituted a sovereign act for which the Government, in its role as contractor, could not be held liable for breach. Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L. Ed.2d 111 (1963). In the present case,

**768**

however, plaintiff brings forth three new arguments in the light of *Miller* and decisions which have followed it. These arguments are:

(1) that defendant had a duty to disclose to plaintiff its *superior knowledge* of the impending interest guaranty rate increase;

(2) that defendant *misrepresented* in its bid documents the interest guaranty rate which would prevail at the time of contracting;

(3) that defendant *hindered* plaintiff's *performance* of the subject contract by increasing the interest guaranty rate and by other acts in the context of that rate increase.

Defendant counters with an affirmative defense which successfully prevails over all three of these contentions, *viz.*, that the FHA guaranty rate increase was not the proximate cause of plaintiff's additional costs. Plaintiff's asserted additional costs resulted not from the increase in interest rate itself, but from an increase in "points" (or additional fee) which the private lender imposed *above and beyond* the interest rate.

In its bid, plaintiff had already estimated $220,000 in additional fees (or three "points") beyond the 4¼ per cent interest rate. An increase in the interest rate from 4¼ to 4½ per cent on plaintiff's mortgage would have resulted in an additional yield to the lender of $185,000. In other words, the Government's action in no way assured lenders any greater yield (over the 4¼ per cent interest return) than plaintiff had already estimated and included as the cost of financing in its bid.

Instead, the lending institution on its own accord decided that a return of $185,000 above a 4¼ per cent mortgage, as would be obtained with a 4½ per cent mortgage, was not sufficient. It decided it wanted to keep charging three "points" on the yield which would be returned at the increased 4½ per cent interest rate. This could be and was accomplished by charging approximately

5⅝ "points" above plaintiff's fixed 4¼ per cent guaranteed interest rate to throw off $420,000 in additional fees rather than the $220,000 estimated by plaintiff.

■ Thus, it was the *lender's* desire to reap a yield of $420,000 in additional fees which resulted in plaintiff's additional costs here, not the *Government's* decision to permit a yield of $185,000 above a 4¼ per cent mortgage by raising the guaranteeable interest rate to 4½ per cent. In reaching this conclusion, we are troubled by the incomplete nature of stipulated facts surrounding this technical issue. On balance, however, our decision must be governed by the basic precept that it is the plaintiff who carries the burden of proof in establishing breach of contract and this responsibility encompasses ensuring that the stipulated facts adequately support its cause of action.

■ On the record as stipulated, the Government's action cannot be seen to have directly or proximately caused plaintiff's asserted injury. *See* National Bank of North America v. United States, 456 F.2d 754, 760, 197 Ct.Cl. 948, 959 (1972). As we said on this issue in *Miller*, 161 Ct.Cl. at 470–471:

The important consideration is that 4¼% financing was available albeit at a greater discount than plaintiff apparently wished to pay.

It could well be that this increased discount expense was due to the then state of the market and anticipated charges in the Government's market rate. But these factors are immaterial since market fluctuations affecting the cost of financing are risks the bidder must assume just as he assumes the risk of higher labor and material costs.

Thus, the Government cannot be considered liable for plaintiff's additional costs and the present action must fall.

Although defendant's affirmative defense of "no proximate cause" may stand alone, we briefly now turn our attention to plaintiff's three other argu-

ments, each interesting and important in its own right.

We hold that the Government must also prevail on all three, considered *seriatim* below:

### Superior Knowledge

Plaintiff's first argument is that relevant agents of defendant actually or constructively knew of the imminence of the FHA interest guaranty rate increase before plaintiff; that this information was vital to plaintiff's performance of the contract; and that defendant's failure to divulge this superior knowledge, which resulted in plaintiff's injury, thus constituted a breach of contract. It is established that the superior knowledge principle, as it has developed since *Miller,* stands independent of the sovereign act defense. *See* J. A. Jones Construction Co. v. United States, 390 F.2d 886, 887, 182 Ct.Cl. 615, 618 (1968); Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 198 Ct.Cl. 472 (1972). Thus,

> while the defendant had no obligation to prevent (and, indeed, was free to precipitate) the avalanche that buried the contractor, it was not free, if it was aware of the impending avalanche and knew that [the bidder] was not, to stand aside and let the bidder be overwhelmed without warning.

J. A. Jones Construction Co. v. United States, *supra,* 390 F.2d at 888, 182 Ct.Cl. at 619.

But did the Government have superior knowledge in this case? Was it withheld so as to cause plaintiff's loss?

From the stipulated facts, we can reasonably infer that plaintiff had sufficient notice to protect itself both *before* and *after* the interest guaranty rate announcement.

First, the parties have stipulated that it was not customary for Capehart contractors to enter into firm construction mortgage commitments *before* their bids were accepted because such prior commitments required substantial "standby" fees. Yet, we believe that a depar-

ture by plaintiff from such customary practice would have been reasonable in light of the rumors which circulated in the financial community by early February 1959 concerning an impending increase in the FHA guaranty rate. Does plaintiff ask us to believe that in its world of construction and finance it had never heard of the possibility of changing interest rates? Again, of special relevance in this regard is our statement in *Miller* that "market fluctuations affecting the cost of financing are risks the bidder must assume just as he assumes the risk of higher labor and material costs." Anthony P. Miller, Inc. v. United States, *supra,* 161 Ct.Cl. at 471.

Second and more importantly, even *after* the public announcement of the guaranty rate increase, plaintiff retained the option of mitigating damages which it anticipated would result. Upon receipt of its Letter of Acceptability, plaintiff was obligated only to complete necessary arrangements in preparation for the initial closing of the construction contract. Among these arrangements was the securing of private financing for the construction undertaking. Had plaintiff determined it disadvantageous to secure financing for the increased "points" in question without obtaining defendant's agreement to defray such higher expenses, plaintiff could have refused to enter the binding contract for construction of the Glasgow project and forfeited only liquidated damages (in this case, $25,000) in the process. This, in fact, was the option selected by the contractor in *Miller.* Indeed, the present factual situation is less favorable to plaintiff than that in *Miller* since here there is no evidence that plaintiff balked at securing financing subsequent to the guaranty rate increase. In summary, we find the assertion of superior knowledge here to be factually without merit since plaintiff had sufficient notice of the FHA interest guaranty rate increase to protect itself against any resulting additional costs. *See* Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 547, 184

Ct.Cl. 18, 38 (1968); J. A. Jones Construction Co. v. United States, *supra* 390 F.2d at 893, 182 Ct.Cl. at 628; Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 457, 145 Ct.Cl. 387, 392 (1959).

## Misrepresentation

■ Regarding plaintiff's second contention, we hasten to affirm at the outset that plaintiff may not be heard to suggest that the Air Force represented that the 4¼ per cent FHA interest guaranty rate, which prevailed when the Glasgow project IFB was issued, would remain unchanged through the time at which plaintiff secured its construction financing. It is established beyond dispute that one Government agency is without power to bind another to refrain from performing a sovereign act. Anthony P. Miller, Inc. v. United States, *supra*, 161 Ct.Cl. at 471–472; Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 389, 158 Ct.Cl. 455, 460 (1962).

■ According to a recent pronouncement of the principle of misrepresentation in bid documents, defendant did have a continuing responsibility to exercise reasonable care to discover if, by the time of contracting, its representations were characterized by any "substantial incorrectness." Womack v. United States, 389 F.2d 793, 799, 182 Ct.Cl. 399, 410 (1968). In neither the type of misrepresentation alleged nor the degree of awareness of defendant's contracting agents, however, does the situation at bar approach that presented in *Womack*, where the defendant's agent was manifestly negligent in carrying out an inspection visit for the purpose of expediting performance of the subject contract. In addition, as indicated in our discussion of the superior knowledge contention above, the situation at hand is one in which plaintiff "could and should have helped itself" as regards the adverse impact of the FHA interest guaranty rate increase. Aerojet-General Corp. v. United States, 467 F.2d 1293, 1303, 199 Ct.Cl. 422, 439 (1972). We find no actionable misrepresentation on the part of defendant.

## Hindrance of Performance

As indicated above, plaintiff's argument that the Government breached its implied duty not to hinder the contractor's performance of his undertaking by increasing the FHA interest guaranty rate was disposed of in *Miller*. The court there applied the time-tested precept that

"the United States when sued as a contractor can not be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." Horowitz v. United States, 267 U.S. 458, 461 [45 S.Ct. 344, 69 L.Ed. 736] (1925); Deming v. United States, 1 Ct.Cl. 190 (1865).

Anthony P. Miller, Inc. v. United States, *supra*, 161 Ct.Cl. at 472.

We find no reason to believe the application of this principle to the action here in question has lost any vitality since *Miller*. Indeed, it has since been reinforced by our decision in Air Terminal Services, Inc. v. United States, 330 F.2d 974, 165 Ct.Cl. 525, cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964). There we held, 330 F.2d 974, 165 Ct.Cl. at 532, that an implied warranty not to hinder a contract's performance cannot be discerned when statutory authority, of which the public is charged with knowledge, exists for the governmental action in question. In the present case, the Capehart Act put the public—and certainly Capehart contractors—clearly on notice that the Commissioner of FHA was empowered to raise at his discretion the federal housing interest guaranty rate to 4½ per cent.

■ Plaintiff further contends that defendant effectively hindered performance of the subject contract through other actions taken in the context of the guaranty rate increase. Specifically, plaintiff urges that promulgation of Defense Department guidelines allowing cancellation and rebidding of some Capehart projects for which letters of acceptability had *not* issued before the FHA interest rate increase, but requiring per-

formance at the 4¼ per cent interest rate of projects (including plaintiff's) for which letters of acceptability *had* already issued, constituted hindrance of plaintiff's performance of the Glasgow project. In issuing such guidelines, plaintiff argues, defendant acted in its role of contractor, not sovereign. We reject, however, this effort to delimit defendant's sovereign act immunity. Reasonable steps by the appropriate Government agency to put into effect a sovereign act can no more than the act itself be considered a breach of the implied duty not to hinder contract performance. Consequently, we find plaintiff's final argument to be without merit.

## CONCLUSION OF LAW

Upon the foregoing opinion, which contains the essential findings of fact as stipulated by the parties, the court concludes as a matter of law that plaintiff's claim for recovery of additional costs should not be allowed. Accordingly, the petition is dismissed.